# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **BRITTANY BONGIOVANNI, JESSICA CALDWELL, ERIN DAVIS, PAUL DEE, VIVIENNE DYAL, WILLIAM FREINCLE, TORREY HAMILTON, NICHOLAS HARWOOD, JOHN HYATT, LUCIAN KINS, EDWARD MACIE, CHARLES MATHIS, JOSEPH MAZURE, JOHN MCAFEE, JACOB MONTOYA, TAMMARA NYKUN, NICHOLAS POEHLER, ANDREW RUPP, and KYLE SINGLETARY,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| vs. | ) ) | |
| **LLOYD AUSTIN, III, in his official capacity as Secretary of Defense, U.S. Department of Defense** | ) ) ) ) | **CASE NO.** |
| **FRANK KENDALL, in his official capacity as Secretary of the Air Force, Department of the Air Force,** | ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **KARL SCHULTZ, in his capacity as Commandant of the Coast Guard,** | ) ) ) ) | |
| **CARLOS DEL TORO, in his official capacity as Secretary of the Navy, Department of the Navy, and** | ) ) ) ) | |
| **CHRISTINE WORMUTH, in her official capacity as Secretary of the Army, Department of the Army,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## **TABLE OF CONTENTS**

INTRODUCTORY STATEMENT ................................................................. 1

PARTIES ........................................................................................................ 7

JURISDICTION AND VENUE ................................................................... 25

STATEMENT OF FACTS ........................................................................... 26

I.   COVID-19 VACCINE MANDATES ................................................... 26

  A.   COVID-19 Discovery and Public Health Emergency ........................ 26

  B.   DOD MANDATE ................................................................................ 27

  C.   FEDERAL VACCINE MANDATES .................................................. 28

II.  ARMED SERVICES GUIDANCE AND IMPLEMENTATION ................ 30

  A.   Religious Accommodation Requests and Appeals.................................. 31

  B.   Medical and Administrative Exemptions............................................... 32

  C.   Disciplinary Actions for Vaccine Refusal ............................................ 33

III.  COMPARISON OF EUA TREATMENTS WITH FDA-LICENSED AND
    LABELED COVID-19 TREATMENTS........................................................ 33

  A.   FDA Emergency Use Authorization ...................................................... 33

  B.   Informed Consent Requirements for EUA Products ............................. 34

  C.   FDA Licensing and Labeling Requirements ......................................... 35

  D.   Comirnaty Approval and Pfizer EUA Re-Issuances .............................. 36

  E.   Spikevax Approval and Moderna EUA Re-Issuance ............................. 38

  F.   Differences Between EUA and Licensed Vaccines ............................... 39

IV.  SCIENTIFIC EVIDENCE AND ADMINISTRATIVE ACTIONS FOR
    COVID-19 mRNA "VACCINES" .................................................................. 40

  A.   Novel Technology with Insufficient Clinical Trial Data......................... 40

  B.   Evidence of Rapidly Decreasing Efficacy or Obsolescence.................... 42

  C.   Vaccine Injuries and Side Effects .......................................................... 43

  D.   Vaccination Does Not Prevent COVID-19 Transmission. ...................... 45

  E.   Quarantine & Testing Provide Equal or Greater "Protection." ............. 47

  F.   Natural Immunity Provides Superior Protection to Vaccination. ......... 48

  G.   Alternative and Effective Treatments for COVID-19............................. 49

V. PLAINTIFFS RELIGIOUS ACCOMMODATION REQUESTS ............... 50

  A. Plaintiffs' Sincerely Held Religious Beliefs.............................................. 50

  B. COVID-19 Vaccines Are Critically Dependent on, and Could Not Exist but for, the Use of Aborted Fetal Cell Tissue. ................................................ 52

  C. Plaintiffs' RARs and Appeals Have Been Denied with "Magic Words," Rather Than Individualized Assessments..................................................... 53

VI. PLAINTIFFS WILL SUFFER CONCRETE AND PARTICULARIZED HARM FROM DEFENDANTS' ACTIONS ................................................. 58

  VIOLATION OF RELIGIOUS FREEDOM RESTORATION ACT .............. 62

  VIOLATION OF FIRST AMENDMENT FREE EXERCISE CLAUSE ....... 69

  VIOLATION OF FIFTH AMENDMENT DUE PROCESS CLAUSE .......... 73

  VIOLATIONS OF INFORMED CONSENT LAWS & PHSA ...................... 76

  VIOLATIONS OF ADMINISTRATIVE PROCEDURE ACT ...................... 81

  DECLARATORY AND INJUNCTIVE RELIEF........................................... 85

RELIEF REQUESTED ...................................................................................... 86

CERTIFICATE OF SERVICE.......................................................................... 88

# LIST OF EXHIBITS

EXHIBIT 1: Plaintiffs' Declarations

EXHIBIT 2: Secretary of Defense Memorandum (Aug. 24, 2021)

EXHIBIT 3: February 4, 2022 Compliance Notice

EXHIBIT 4: Aug. 23, 2021 EUA Re-Issuance Letter

EXHIBIT 5: Oct. 29, 2021 EUA Re-Issuance Letter

EXHIBIT 6: Jan. 3, 2022 EUA Re-Issuance Letter

EXHIBIT 7: Air Force Guidance (Sept. 3, 2021)

EXHIBIT 8: Army Guidance (FRAGO 5) (Sept. 14, 2021)

EXHIBIT 9: Marine Corps Guidance MARADMIN 462/21 (Sept. 1, 2021)

EXHIBIT 10: Navy Guidance ALNAV 062/21 (Aug. 30, 2021)

EXHIBIT 11: DOD Surgeon Generals Guidance (Sept. 14, 2021)

EXHIBIT 12: Jan. 31, 2022 Moderna EUA Re-Issuance

EXHIBIT 13: Aug. 23, 2021 Comirnaty Summary Basis of Regulatory Action

EXHIBIT 14: Nov. 8, 2021 Comirnaty Summary Basis of Regulatory Action

EXHIBIT 15: NIH-Pfizer Announce Comirnaty Unavailability (Sept.13, 2021)

EXHIBIT 16:  Declaration of Dr. Peter McCullough

EXHIBIT 17: Sen. Ron Johnson Letter to Secretary Austin (Feb. 1, 2022)

EXHIBIT 18: Office of Legal Counsel, Vaccine Mandate Opinion (July 6, 2021)

Plaintiffs, by and through the undersigned counsel, hereby complain and allege the following:

## INTRODUCTORY STATEMENT

1.    Plaintiffs are a group of service members from each branch of the armed services. Plaintiffs allege that the Department of Defense ("DOD") COVID-19 vaccine mandate[1] ("DOD Mandate") is unconstitutional because it violates Plaintiffs' religious liberties protected by the First Amendment and the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb-1, *et seq.*, as well as their Fifth Amendment due process rights. The DOD Mandate is also unlawful insofar as it violates federal statutes requiring informed consent for treatments subject to an emergency use authorization ("EUA"), *see* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3 (collectively, the "Informed Consent Laws"), the substantive provisions of the Public Health Service Act ("PHSA"), 42 U.S.C. § 262, and multiple provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, as well as the DOD's own rules, regulations, and procedures.

---

[1] *See* Ex. 2, Secretary of Defense Lloyd Austin, III ("SECDEF"), "Memorandum for Senior Pentagon Leadership, Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members" (Aug. 24, 2021) ("SECDEF Memo"). The DOD Mandate applies to all members of the military services (Air Force, Army, Coast Guard Marine Corps, Navy, collectively referred to hereinafter as the "Armed Services"), each of which has issued its own implementation orders and guidance. *See* Exs. 7-11 (collectively "Armed Services Guidance').

1

2.    On August 24, 2021, one day after the Food and Drug Administration's ("FDA") licensed the Pfizer-BioNTech Comirnaty vaccine, the DOD directed the Armed Services "to immediately begin full vaccination of all members of the Armed Forces," using only "COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA labeling." Ex. 2, SECDEF Memo, at 1. Due to the unavailability of Comirnaty or any FDA-licensed vaccines labeled as such, the DOD and Armed Services have directed healthcare providers to administer non-FDA-licensed EUA vaccines "as if" they were, or were legally "interchangeably" with, FDA-approved vaccines, pursuant to the mandate. Service members who decline injection of an unlicensed EUA vaccine may face the full range of administrative and disciplinary sanctions under the Uniform Code of Military Justice ("UCMJ") including involuntary separation, less than honorable discharge, and court-martial; the loss of retirement, veterans and other government benefits they have earned through long service to their country, valued in excess of $1,000,000 in many cases; obstacles to future employment due to their discharge status; and loss of fundamental rights.

3.    Evidence submitted in a related proceeding in this District, *Navy SEAL 1 v. Biden*, No. 8:21-cv-02429-SDM-TGW (M.D. Fla.) ("*Navy SEAL 1* Proceeding"), conclusively demonstrates that Defendants have systematically

2

and willfully violated service members' free exercise rights under RFRA and the First Amendment because they have not granted any religious accommodation requests ("RARs") out of at least 25,000 submitted. *See* Ex. 3, February 4, 2022 Compliance Notice. Courts in this District and elsewhere have concluded that the Defendants' religious exemption process appears to be a "sham,"[2] and a "quixotic quest" that amounts to little more than "theater."[3] There is no question that the DOD Mandate and Defendants' religious exemption policy substantially burden Plaintiffs' exercise of religion, which triggers strict scrutiny, as well as RFRA's requirement to show that strict scrutiny is satisfied for each specific denial. Nor is there any question that that Defendants' policy of blanket denials by reciting the "magic words"[4] of the

---

[2] *Navy SEAL 1 v. Biden,* No. 8:21-cv-2429, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021). The Air Force and Marine Corps purport to have recently granted a handful of RARs (*i.e.*, roughly a dozen out of nearly 25,000). *See* Ex. 3, Defendants February 4, 2022 Notice. However, these RARs appear to have been granted to those on terminal leave or conditioned upon their separation from the military. *See Navy SEAL 1 v. Austin*, --- F.Supp.3d ---, 2022 WL 534459, at *19 (M.D. Fla. Feb. 18, 2022) ("*Navy SEAL 1*") (Marine Corps approvals); *Poffenbarger v. Kendall*, No. 3:22-cv-1, 2022 WL 594810, at *13 n.6 (S.D. Oh. Feb. 28, 2022) ("*Poffenbarger*") (Air Force approvals). Thus, even the exceptions to the general policy of denying them all demonstrate that the process is a sham because the result is that no service member will be granted religious accommodation and allowed to continue their service.

[3] *Air Force Officer v. Austin*, --- F.Supp.3d ---, 2022 WL 468799, at *1 (M.D. Ga. Feb. 15, 2022) ("*Air Force Officer*") (citation omitted); *U.S. Navy SEALs 1-26 v. Biden*, --- F.Supp.3d. ---, 2022 WL 34443, at *1 (N.D. Tex. Jan. 3, 2022) ("*Navy SEALs 1-26*"), *stay denied*, --- F.4th ---, 2022 WL 594375 (5th Cir. Feb. 28, 2022) ("*Navy SEALs 1-26* Stay Order").

[4] *Navy SEAL 1*, No. 8:21-cv-2429, 2022 WL 534459, at *17 (*quoting Davila v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015) ("*Davila*")).

statute and invoking vague appeals to military readiness and health—without any specific and reliable evidence demonstrating that the individual service member's request could not be accommodated and why no less restrictive means can achieve the government's interest—manifestly fails strict scrutiny.[5] For largely the same reasons, Defendants' sham religious exemption process, with its predetermined outcome of uniform denials, deprives Plaintiffs of their Fifth Amendment due process rights.

4.    The Omicron variant, the vaccines' rapidly declining efficacy, and existing mitigation measures have fatally undermined Defendants' claims that denying Plaintiffs' exemptions serves any compelling governmental interests or is in fact the least restrictive means of achieving those interests. According to Pfizer's CEO, "we know that the two doses of the vaccine" mandated by the DOD "offer very limited protection, if any"[6] against the Omicron variant that currently accounts for nearly 100% of cases.[7] Vice Admiral William Merz

---

[5] *Navy SEAL 1*, at *17-19 (finding that the Marine Corps and Navy had not shown that their policy satisfied strict scrutiny); *Air Force Officer*, 2022 WL 468799, at *10-12 (same with respect to the Air Force); *Navy SEALs 1-26*, 2022 WL 34443, at *10-12 (same with respect to the Navy).

[6] *New COVID-19 Vaccine That Covers Omicron 'Will Be Ready in March,' Pfizer CEO Says* YAHOO!FINANCE (Jan. 10, 2022) (transcript of video interview with Pfizer CEO Albert Bourla), available at: https://finance.yahoo.com/video/covid-19-vaccine-covers-omicron-144553437.html (last visited Jan. 17, 2022).

[7] *See* CDC, *COVID Data Tracker: Variant Proportions*, Chart: Week Ending February 19, 2022, available at: https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last visited Feb. 22, 2022).

recently acknowledged that Omicron is "coming and going all the time" among 100% vaccinated crews, but that it has had "really no operational impact."[8]

5.    It is undisputed that no FDA-licensed vaccines (Comirnaty or Spikevax) are not available, and that the Defendants are instead mandating EUA vaccines. *See Doe #1-#14 v. Austin*, 2021 WL 5816632, at *5 (N.D. Fla. Nov. 12, 2021) ("*Austin*") (citation omitted). The DOD Mandate and the Armed Services Guidance are unlawful *ultra vires* actions that are void *ab initio* insofar as they mandate injection of a non-FDA-licensed, EUA vaccine, which is expressly prohibited by 10 U.S.C. § 1107a. These directives are also unlawful insofar as they direct providers to inject non-FDA-licensed, EUA vaccines as if they were the unavailable FDA-licensed vaccines, *see infra* ¶¶ 54-55, treat EUA and FDA-licensed vaccines as legally interchangeable, and seek to deceive service members' into forfeiting their informed consent right to refuse

---

[8] Diana Correll, *Omicron Isn't Significantly Impacting Navy Operations, Admiral Says*, NAVYTIMES (Jan. 27, 2022), available at: https://www.navytimes.com/news/your-navy/2022/01/27/omicron-isnt-significantly-impacting-navy-operations-admiral-says/ (last visited Mar. 1, 2022). Vaccination did not prevent a December 2021 Omicron outbreak in which 25% of the crew of the 100% vaccinated *USS Milwaukee* tested positive for COVID-19. *See* Lolita C. Baldor, *Nearly 25 percent of USS Milwaukee Crew Hass COVID-19, Officials Say*, Navy Times (Dec. 27, 2021), available at: https://www.navytimes.com/news/your-navy/2021/12/27/nearly-25-percent-of-uss-milwaukee-crew-has-covid-19-officials-say/ (last visited Feb. 22, 2022). Nor did it prevent the recent infections of the fully vaccinated (and boosted) Secretary of Defense Austin, Chairman of the Joint Chiefs of Staff Milley, and Commandant of the Marine Corps Berger. *See Air Force Officer*, 2022 WL 468799, at *10 (citation omitted).

an EUA vaccine that the PHSA and FDA labeling regulations required to be clearly stated in every package sold or distributed in the United States. In addition, the DOD Mandate and Armed Services Guidance violate multiple provisions of the APA.

6.     Plaintiffs file this action seeking an Administrative Stay, Temporary Restraining Order, Preliminary Injunction and Declaratory Judgment requesting that this Court:

(1) Declare the DOD Mandate to be an unconstitutional, unlawful, and *ultra vires* action;

(2) Enjoin the implementation or enforcement of the DOD Mandate and the Armed Services Guidance by the Defendants with respect to the Plaintiffs;

(3) Declare that the Defendants' religious exemption process violates services members' rights under RFRA, the First Amendment Free Exercise Clause, and the Fifth Amendment Due Process Clause, and that Defendants' religious exemption processes fails to satisfy strict scrutiny;

(4) Enjoin any adverse or retaliatory action against the Plaintiffs as a result of, arising from, or in conjunction with the Plaintiffs' RAR requests or denials, or for pursuing this action, or any other action for relief from Defendants' constitutional, statutory, or regulatory violations; and

(5) Declare unlawful the injection of any EUA vaccine pursuant to the DOD Mandate or the Armed Services Guidance.

7.     Plaintiffs seek this relief pursuant to the APA, 5 U.S.C. §§ 702 and 705; the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and § 2202; and the All Writs Act, 28 U.S.C. § 1651.

## PARTIES

8.      Plaintiffs are active-duty or reserve duty service members who are subject to the DOD Mandate, as implemented through the Armed Services Guidance of the branch in which they serve. Plaintiffs' declarations in Exhibit 1 hereto provide additional information regarding their religious and medical exemption requests, the guidance and orders that they have received (including orders to receive EUA vaccines in place of licensed vaccines), administrative and disciplinary actions, and copies of the letters denying their initial RAR and appeals.

9.      Plaintiff BRITTANY BONGIOVANNI is a Lieutenant Junior Grade ("LTJG") in the United States Navy in which she has served for just under 3 years. LTJG Bongiovanni is stationed at Mayport Naval Station, and she is domiciled in Mayport, Duval County, Florida. On October 7, 2021, she submitted her initial RAR, which was denied on November 28, 2021, and on December 3, 2021, she submitted her appeal, which was denied on January 26, 2022. On January 31, 2022, she was notified of the denial, and she was then ordered via an email from her commanding officer to get the vaccine within five days. She was then notified of a Report of Misconduct and was forced to sign a newly edited "Page 13" (signed under duress) counseling statement, and she has been repeatedly ordered to take the vaccine or else face separation and discharge. As a result of her unvaccinated status and request for religious

7

exemption, LTJG BONGIOVANNI has faced harassment and bullying based on her beliefs, questioning of her religion, violations of her medical privacy, and has been singled out by multiple commands. She faces consequences of not receiving a promotion, delay in any further execution of orders, and is being threatened to repay her Naval Academy education ($70,000-$100,000) despite being forced out on religious terms. LTJG BONGIOVANNI has expressed several times to her chain of command that she is willing and desires to fulfill her commitment. She is not choosing to be discharged from the Navy. If involuntarily separated due to her vaccination status, LTJG BONGIOVANNI stands to lose pay and benefits of somewhere between of approximately $3,200,000.

10.    Plaintiff JESSICA CALDWELL is a Master Sergeant ("MSGT") in the United States Air Force Reserve in which she has served for 16 years. She is domiciled in Nevada and currently stationed in Georgia. She has served for 16 years and has received multiple high-level achievement awards, including the U.S. Air Force Special Recognition Ribbon. On September 28, 2021, MSGT CALDWELL submitted her initial RAR, which was denied on October 27, 2021, and her appeal was denied on December 6, 2021. MSGT CALDWELL is also in remission from cancer; when she brought up her medical concerns regarding vaccination, she was advised that her history of cancer would not be grounds

for medical exemption. After receiving her RAR denial, she was given five days to get vaccinated or she would be separated for vaccine refusal. On February 11, 2022, she received a General Officer Letter of Reprimand for refusal to obey a lawful order under Article 92 of the UCMJ.

11.    Plaintiff ERIN DAVIS is a Captain in the Space Force in which she has served for 4.5 years. CAPT DAVIS is stationed at Buckley Space Force Base, Colorado, and she is domiciled in Melbourne, Brevard County, Florida. She submitted her initial RAR in September 2021, which was denied on February 3, 2022. She confirmed in September 2021 that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. On February 22, 2022, CAPT DAVIS was informed that she must provide proof of vaccination, despite the unavailability of any FDA-licensed vaccine, or else face possible administrative actions and involuntary separation. As a result of her unvaccinated status, CAPT DAVIS is non-deployable and has been prohibited from any permanent change of station ("PCS") and therefore any new assignments.

12.    Plaintiff PAUL DEE is a Captain ("CAPT") in the United States Navy, with 28 years of service. He is domiciled in Tampa, Hillsborough County, Florida, and until September 2, 2021, was the Commanding Officer of the New York Navy Reserve Center New York City. CAPT DEE submitted his initial

RAR on August 29, 2021, which was denied October 20, 2021, and he filed his
appeal November 23, 2021, which is still pending. After release of the SECDEF
Memo, he was urged by his command to be vaccinated by September 2, 2021,
and to order all of the sailors under his command to be vaccinated, despite the
unavailability of the licensed vaccine. CAPT DEE was unwilling to transmit to
the sailors under his command what he believed was an illegal, unethical and
immoral order to take an unapproved and unsafe vaccine. When he expressed
his concerns to his command, they urged him to resign his command, which he
did on September 2, 2021. As a result of his resignation, CAPT DEE is facing
Detachment for Cause ("DFC") proceedings, which may result in involuntary
administrative separation and a show cause proceeding before a Board of
Inquiry could result in additional penalties under the UCMJ. He may avoid
some of these consequences through early retirement, which will result in a
loss of pay and benefits of up to $500,000 or more.

13.    Plaintiff VIVIENNE DYAL is a Petty Officer Second Class ("PO2")
in the United States Coast Guard in which she has served for 8 years. PO2
DYAL is stationed at USCG Base Galveston, Texas, and she is domiciled in
Cape Coral, Lee County, FL. She submitted her initial RAR on March 24, 2021,
which was denied on June 7, 2021, and she submitted her appeal November 1,
2021, which is still pending. PO2 DYAL pursued a temporary medical

10

exemption for breastfeeding once the mandate started since she had returned to work from maternity leave on August 16, 2021. On September 13, 2021, PO2 DYAL was required to sign a CG3307 PD41A counseling form about administrative or punitive actions that could be taken against her for refusal. As a result of her unvaccinated status, PO2 DYAL has experienced multiple issues such having her separation request for care of a newborn put on abeyance, has a unknown future in the USCG Reserves while awaiting the outcome of her RA Appeal, and has been limited to a 50-mile radius from home or work since September 2021, and is restricted from PCS or TDY travel. PO2 DYAL's future for returning to Active Duty or reserve components are unknown due to this mandate's restrictions. PO2 DYAL is currently scheduled to separate from Active Duty on June 1, 2022, and enlisting in the USCG Reserves for three years on June 2, 2022. If involuntarily separated due to her vaccination status, PO2 DYAL stands to lose pay and benefits of somewhere between $2,500,000 to over $3,600,000 in 2022 dollars.

14.    Plaintiff WILLIAM FREINCLE is a Sergeant First Class ("SFC") in the Army with nearly 19 years of service. SFC FREINCLE is stationed at Camp Shelby, Mississippi, and he is domiciled in Brandon, Hillsborough County, Florida. He confirmed on October 20th, 2021 that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. On

11

October 29, 2021, SFC FREINCLE was informed that he must provide proof of vaccination, despite the unavailability of any FDA-licensed vaccine. SFC FREINCLE has refused to take an EUA vaccine, and at no time has he refused to take a fully FDA-licensed vaccine. On November 10, 2021, SFC FREINCLE received a General Officer Letter of Reprimand ("GOMOR"). On February 7, 2022, his command initiated the involuntary separation process under AR 635-200, para 14-c "for commission of a serious offense," which was completed on February 21, 2022. A separation Board of Inquiry will determine his discharge status, which will be less than a full honorable discharge.

15.    Plaintiff TORREY HAMILTON is a Lieutenant Colonel in the U.S. Air Force in which he has served for 15 years. LT COL HAMILTON is stationed at Joint Base Pearl Harbor Hickam, Hawai'i, and he is domiciled in Rockledge, Brevard County, Florida. On September 13, 2021, LTC HAMILTON submitted his initial RAR, which was denied on February 7, 2022, and he submitted his appeal on February 13, 2022, which is still pending. LT COL HAMILTON received a temporary medical exemption for Reactive Arthritis, a condition identified by the CDC as a specific precaution before receiving a COVID-19 vaccination. He is seeking a permanent medical exemption, which the Air Force had directed medical personnel not to approve, and his attempts to consult military specialists have been denied. He has filed three IG complaints

12

in connection with the DOD Mandate, in particular, refusal to permit airmen to be tested for natural immunity. On September 8, 2021, LT COL HAMILTON confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. On February 7, 2022, he was informed that he will likely eventually be ordered to provide proof of vaccination, despite the unavailability of any FDA-licensed vaccine, or else face progressive discipline for failure to obey a lawful order that may eventually result in an administrative discharge or court martial. LT COL HAMILTON was selected to command the Geospatial Intelligence Analysis Squadron, but his assignment was cancelled on the assumption that both his exemptions from the COVID vaccination would eventually be disapproved. He is also subject to travel and training restrictions, even while his medical exemption is in effect, and he is prohibited from PCS or new assignments. LT COL HAMILTON estimates the value of lost pay and benefits from cancelling his command, lost promotions, and involuntary separation is well in excess of $1,000,000.

16.    Plaintiff NICHOLAS HARWOOD is a Major ("MAJ") in the United States Marine Corps in which he has served for 14 years. MAJ HARWOOD is stationed at Camp Pendleton, California and domiciled in South Daytona, Volusia County, Florida. He submitted his initial RAR on August 22, 2021, which was denied on September 21, 2021, and his appeal was denied December

7, 2021. On December 8 2021, MAJ HARWOOD was provided a written order to receive the FDA-approved vaccine against his religious beliefs by 12:00, December 10, 2021. On December 8, 2021, he confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available at the 13 Area Medical Clinic on base. On December 10, 2021 at 12:01, MAJ HARWOOD was given punitive disciplinary paperwork for "failure to obey a lawful order" for not submitting to the COVID-19 inoculation, despite the unavailability of any FDA-licensed and appropriately labeled vaccine. As a result of his unvaccinated status, MAJ HARWOOD was disciplined and relieved from his position as the Executive Officer for a loss of confidence in his ability to lead, and he was transferred to another unit. He has been ordered to finish his final medical separation screening and complete Transition Readiness Seminar as part of the administrative separation process. His command has informed him that he will face a Board of Inquiry, which will determine his separation from the Marine Corps and his characterization of discharge. As a result of possible early separation, Major Harwood stands to lose military pay and benefits in the amount of $4,700,000 in 2022 dollars.

17.    Plaintiff JOHN HYATT is Chief Warrant Officer-4 ("CWO-4") in the United States Marine Corps in which he has served for 26 years. He is domiciled in Tampa, Hillsborough County, Florida, and he is currently

14

stationed in Hawaii. On September 8, 2021, CWO-4 HYATT was informed that the vaccination deadline was September 9, 2021. After confirming with his base's medical facility that the FDA-licensed Comirnaty vaccine was not available there or anywhere else in Hawaii, he challenged the legality of the order. On October 6, 2021, CWO-4 HYATT submitted his initial RAR, which was denied on November 24, 2021, and he submitted his appeal on December 8, 2021, which is still pending.

18.    Plaintiff LUCIAN KINS is a Commander ("CDR") in the United States Navy in which he has served for 17 years. CDR KINS is stationed at Mayport, Florida and domiciled in Jacksonville, Duval County, Florida. On September 3, 2021, he submitted his initial RAR, seeking exemption from multiple vaccines which contain and/or were developed through testing against aborted baby cells, including the COVID-19 vaccines, which was denied on 22 October 2021. On November 2, 2021, he submitted his appeal, which was denied on January 24, 2022. CDR Kins has also submitted an Article 138 complaint challenging the lawfulness of orders related to the mandate and discriminatory testing of the unvaccinated, which was dismissed. On December 10, 2021, CDR KINS received an Article 15, or non-judicial punishment ("NJP"), for failure to obey a lawful order under Article 92 of the UCMJ, and he was removed from his position as the Executive Officer of USS

WINSTON S CHURCHILL (DDG 81). On January 4, 2022, he submitted an appeal to the Article 15 proceeding, which was denied on January 24, 2022. On January 26, 2022, CDR KINS was notified that his RA and Article 15 appeals had been denied, and ordered that he must become fully vaccinated within five calendar days, despite the unavailability of any FDA-licensed vaccine (*i.e.*, neither Comirnaty nor Moderna's Spikevax). He is now awaiting notification of a Board of Inquiry that will determine whether he will be involuntarily separated due to his unvaccinated status.

19.    Plaintiff EDWARD MACIE is a Lieutenant ("LT") in the United States Navy in which he has served for 20 years. LT Macie is stationed in Jacksonville, Duval County, Florida. He submitted his initial RAR on September 22, 2021, which was denied on December 3, 2021, and he submitted his appeal on January 1, 2022, which is still pending. LT MACIE has natural immunity from a documented previous COVID-19 infection in January 2022. LT MACIE is the Medical Administration Officer who oversees medical supply, including vaccines, for Naval Station Mayport. Since the announcement of the DOD Mandate, he has continuously and repeatedly inquired as to the availability of FDA-approved vaccines, and confirmed that neither Comirnaty nor any other FDA-approved vaccines are available and that his command is instead using EUA COVID inoculations. Further, base immunization has

informed him that they in fact have Comirnaty, and when challenged, asserted that Pfizer-BioNTech EUA vaccines are the "same" as what is labeled Comirnaty; base immunization could not produce to him and to other service members the EUA product insert required by the FDA, which specifically instruct providers to inform patients that they are administering an EUA product. If, as expected, LT MACIE is involuntarily separated due to his vaccination status, he stands to lose pay and benefits of somewhere between $1,000,000 and over $2,500,000 in 2022 dollars.

20.    Plaintiff CHARLES MATHIS is a Commander ("CMDR") in the Coast Guard in which he has served for 17 years.  CMDR MATHIS is stationed at Cecil Field in Jacksonville, Duval County, Florida. On October 6, 2021, he submitted his initial RAR, which was denied on December 16, 2021, and he submitted his appeal on January 18, 2022, which is still pending. He tested positive for COVID-19 on January 24, 2022.  He has been informed by his primary care manager on base that no new medical exemptions would be considered or granted.  On February 23, 2022, CMDR MATHIS confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available at the on base clinic, and on February 24, 2022, he separately confirmed the same from Pfizer. As a result of his unvaccinated status, CMDR MATHIS is restricted from travel and training, and he has been informed that

he may be subject to administrative and punitive sanctions and involuntary separation from the Coast Guard.

21.    Plaintiff JOSEPH MAZURE is Technical Sergeant ("TSGT") in the U.S. Air Force in which he has served for nearly 15 years. He is currently stationed at Hurlbert Field, Florida, and he is domiciled in Navarre, Santa Rosa County, Florida. On October 4, 2021, TSGT MAZURE submitted his initial RAR, which was denied on December 5, 2021, and on December 16, 2021, he submitted his appeal, which was denied on January 21, 2022. TSGT MAZURE was diagnosed with COVID-19 on January 24, 2022. On January 31, 2022, TSGT MAZURE was ordered to provide proof of vaccination in five days (*i.e.*, February 5, 2022), but due to his COVID infection, he was granted a 30-day temporary exemption, that expires March 1, 2022, and then will have to provide proof of vaccination by March 5, 2022, or else he will be involuntarily separated and face other administrative or punitive actions. On January 26, 2022, TSGT MAZURE inquired regarding the availability of Comirnaty or other FDA-approved vaccines. He was informed that his base did not have Comirnaty, but instead had only EUA-labeled vaccines, including some purportedly "BLA-compliant" doses that were manufactured prior to the August 23, 2021 approval of Comirnaty that legally could not have been FDA-approved. As a result of his unvaccinated status and submission of an RAR, he

18

is subject to travel and training restrictions that prevent him from maintaining qualifications for his current position, and if involuntarily separated, he estimates that he will lose up to $900,000 or more in pay and benefits.

22.    Plaintiff JOHN MCAFEE is a Lieutenant Colonel in the Air Force in which he has served for nearly 21 years. LT COL McAfee is stationed at Joint Base Andrews, Maryland, and he is domiciled in Rockledge, Brevard County, Florida. Until being removed from his position (see below), Lt Col MCAFEE was the Director, Senior Acquisition Course and an instructor at the National Defense University in Washington, DC.  He previously commanded a contract management office overseeing $8 billion in contracts, implemented cost saving measures resulting in over $2 billion in savings, and led the development of highly classified satellite programs.  He submitted his initial RAR on September 21, 2021, which was denied on January 25, 2022 and received on February 7, 2022. He appealed on February 16, 2022, which is pending. On December 21, 2022, he was illegally fired and reassigned from his senior instructor position in retaliation for filing complaints regarding religious discrimination.  Specifically, Lt Col MCAFEE pursued and/or exhausted the following military remedies in connection with the mandate and subsequent discriminatory treatment, including three complaints to the DOD Inspector General ("IG") (fraudulent vaccine labeling and retaliatory firing; an

Equal Opportunity ("EO") complaint for religious discrimination; an Article 138 complaint; multiple congressional inquiries with responses received from Representative Posey and Senator Rubio. Lt Col MCAFEE estimates that involuntary, premature separation as a result of his faith would cost him $1,750,000 in lost pay and benefits.

23.    Plaintiff JACOB MONTOYA is a Lieutenant Commander ("LCDR") in the Navy in which he has served for 15 years. LCDR Montoya is stationed at Naval Submarine Base New London, CT, and he is domiciled in Fernandina Beach, Nassau County, Florida. Based on his expectation that a mandate would be imposed, LCDR MONTOYA submitted his initial RAR on January 19, 2021, which was denied on August 20, 2021, and his appeal was denied on January 28, 2022. On that same day, January 28, 2022, LCDR MONTOYA was informed that he must provide proof of vaccination within five days, despite the unavailability of any FDA-licensed vaccine, or else he would face DFC and would be removed from his position as Executive Officer of PCU HYMAN G RICKOVER (SSN 795). On February 3 2021, LCDR MONTOYA's Commanding Officer relieved him of his command, and he recommended that LCDR Montoya face a Board of Inquiry for misconduct and that his promotion to Commander (scheduled for September 2022) be withheld.

24.    Plaintiff TAMMARA NYKUN is a Major ("MAJ") in the United States Air Force in which she has served for 22 years. She is stationed at Robins Air Force Base, Georgia, and she is domiciled in Tampa, Hillsborough County, Florida. On October 8, 2021, she submitted her initial RAR, which was denied on 27 Oct 2021, and she submitted her appeal on October 30, 2021, which was denied on December 9, 2021. On September 17, 2021, and as recently as February 17, 2022, she has confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. On October 28, 2021, before she had a chance to submit her RAR appeal, she was instructed by a General Officer to submit her retirement paperwork and would receive punishment if she did not receive the vaccine by December 2, 2021. When her RAR appeal was denied on December 9, 2021, MAJ NYKUN was informed that she must make a decision of whether she would take the vaccination within five days, despite the unavailability of any FDA-licensed vaccine, or else face discipline for failure to obey a lawful order and involuntary separation. As a result of her unvaccinated status, MAJ NYKUN has been involuntarily separated, with terminal leave starting February 7, 2022; forced into early retirement, effective May 1, 2022; lost the opportunity for promotion for which she would otherwise be eligible; and rendered ineligible for an active-duty retirement.

25.    Plaintiff NICHOLAS POEHLER is a Lieutenant in the United States Coast Guard in which he has served for 8.5 years. LT POEHLER is stationed at Helicopter Interdiction Tactical Squadron (HITRON), and he is domiciled in Jacksonville, Duval County, Florida. On September 15, 2021, he submitted his initial RAR, which was denied on January 27, 2022, and he submitted his appeal on February 22, 2022, which is still pending. On September 10, 2021 and subsequently, he has confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. If his RAR appeal is denied, he faces discipline for failure to obey a lawful order punishable under Article 92 of the UCMJ and initiation of discharge proceedings. He would also face losing access to the use and transferability of the Post 9-11 G.I. Bill and would be subject to monetary recoupment for not satisfying any obligated service requirements. As a result of his unvaccinated status, LT POEHLER has been restricted from traveling beyond 50 miles from his work or home; prohibited from commercial air travel or off-base facilities; prohibited from PCS (permanent change of station), to attend Coast Guard C schools or to complete his advance education training requirements for the Aeronautical Engineering program that he is enrolled in. As of December 1, 2021, he is no longer allowed to fly as a helicopter pilot at his unit and has lost his designation as an MH-65D Aircraft Commander. As a

22

result of possible early separation, LT POEHLER has calculated that he stands to lose military pay and benefits in the amount of $2,250,000 and up to $3,250,000 in 2022 dollars.

26.     Plaintiff ANDREW RUPP is a Chief Petty Officer/E-7 in the United States Coast Guard. He has served honorably for 17 years. CHIEF RUPP is stationed in Tampa Bay, Florida and is domiciled in Riverview, Hillsborough County, Florida. He submitted his initial RAR on August 12, 2021. It was never processed. He resubmitted his RAR on September 9, 2021, which was denied on February 4, 2022. On February 11, 2022, he was ordered to submit an appeal to his RAR denial within 10 days, to provided proof of COVID-19 vaccination, or be punished. As a result of his unvaccinated status, CHIEF RUPP has been restricted from taking leave outside 50 miles from the base without approval from his Commanding Officer and he has been denied the opportunity to carry out assignments that would assist in his career progression. He has been threatened with being denied his follow-on orders, the loss of employment and retirement, and other benefits. If involuntarily separated due to his unvaccinated status, the personal financial damages to Chief Rupp would exceed $1.5 million.

27.     Plaintiff KYLE SINGLETARY is a Captain in the United States Air Force in which he has served for nine years. He is stationed at Columbus

Air Force Base, Mississippi, and he is domiciled in Fernandina Beach, Nassau County, Florida. On September 20, 2021, he submitted his initial RAR, which was denied on February 4, 2022, and he submitted his appeal on February 23, 2022, which is still pending. On September 17, 2021, CAPT SINGLETARY submitted a complaint to the Air Force IG regarding for discriminatory remarks by senior Air Force leadership against religious beliefs, which was denied. On September 19, 2021, he has confirmed that neither Comirnaty, nor any other FDA-approved vaccine labeled as such, was available. On September 20, 2021, CAPT SINGLETARY was informed that he must provide proof of vaccination, despite the unavailability of any FDA-licensed vaccine, must submit a religious or medical exemption or else face discipline for failure to obey a lawful order. CAPT SINGLETARY has been informed that not receiving the vaccine could inhibit his career by preventing deployments, PCS, and overall employment by the USAF.

28.     Defendant DOD is a Department of the United States Government. It is led by the Secretary of Defense, Lloyd J. Austin, III, who issued the DOD Vaccine Mandate.

29.     Defendant Department of the Air Force is a Department of the United States Government. It is led by the Secretary of the Air Force Frank Kendall.

24

30.    Defendant Department of the Army is a Department of the United States Government. It is led by the Secretary of the Army Christine Wormuth.

31.    Defendants Marine Corps and Navy are under the Department of the Navy, which is a Department of the United States Government. It is led by Navy Secretary Carlos Del Toro.

32.    Defendant United States Coast Guard is under the Department of Homeland Security, which is a Department of the United States Government. It is led by Commandant Admiral Karl L. Schultz.

## JURISDICTION AND VENUE

33.    This case arises under federal law, namely the First and Fifth Amendments of the United States Constitution, U.S. CONST. AMENDS. I & V; the APA, 5 U.S.C. § 551, *et. seq.*; 10 U.S.C. § 1107a; 21 U.SC. § 360bbb-3; 28 U.S.C. § 1331; 28 U.S.C. § 2201; RFRA, 42 U.S.C. § 2000bb-1, *et seq.*; and 42 U.S.C. § 1981 and § 1983.

34.    The DOD Mandate and Armed Services Guidance are final agency actions, as they mark the consummation of the agency's decision-making process with respect to the DOD's imposition of a vaccine mandate to which Plaintiffs are subject. The DOD Mandate and Armed Services Guidance are *ultra vires* actions in violation of Plaintiffs' federal statutory rights, and to the extent these statutes do not create a right of action, Defendants' actions are

25

agency actions for which is no other adequate remedy in a court that may be brought pursuant to the APA. 5 U.S.C. § 704.

35.    To the extent that Defendants' actions are deemed non-final agency actions that would wholly deprive Plaintiffs of federal statutory rights, the Court has jurisdiction pursuant to its inherent equity powers and federal question jurisdiction under 28 U.S.C. § 2201 and 28 U.S.C. § 1331.

36.    Jurisdiction is proper in this Court under the APA, 5 U.S.C. § 702, and under 28 U.S.C. § 2201, which states that actions involving controversies with federal agencies may be pursued in any United States District Court, and under 28 U.S.C. §§ 1331 and 1346.

37.    Venue is proper in this Court pursuant to 28 U.S.C. §1402 and 28 U.S.C. § 1391(e) because nearly all of the Plaintiffs are stationed and/or domiciled in this District, and because a substantial part of the act or omissions giving rise to the claim, have or will occur in this district, unless this Court grants the relief requested herein.

## STATEMENT OF FACTS

## I.    COVID-19 VACCINE MANDATES

### A.    COVID-19 Discovery and Public Health Emergency

38.    On January 29, 2020, the White House Coronavirus Task Force was established to oversee and coordinate the Trump Administration's response to COVID-19. On January 31, 2020, as a result of confirmed cases of

COVID-19, HHS Secretary Azar determined that a public health emergency existed as of January 27, 2020, pursuant to Section 319 of the PHSA, 42 U.S.C. § 247d *et seq*.

### B.    DOD MANDATE

39.    On August 24, 2021, SECDEF issued the DOD Mandate, directing the Secretaries of the Military Departments "to immediately begin full vaccination of all members of the Armed Forces … who are not fully vaccinated against COVID-19."  Ex. 2, DOD Mandate, at 1. The Secretary further directed that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the [FDA], in accordance with FDA labeling and guidance," and that vaccination requirements are "to be implemented consistent with DoD Instruction 6205.02." *Id.* The SECDEF Memo does not mention EUA or "BLA-compliant" vaccines at all, much less mandate the administration of such vaccines pursuant to the mandate.

40.    The only service members expressly exempted are those "actively participating" in vaccine trials, while "[t]hose with previous COVID-19 infection are not considered fully vaccinated" and thus are not exempted. *Id.* The SECDEF Memo does not discuss religious exemptions, or any other category of medical or religious exemptions.

27

## C.    FEDERAL VACCINE MANDATES

41.    Since the announcement of the DOD Mandate on August 24, 2021, federal agencies or the Executive Branch have issued five additional federal vaccine mandates. On September 9, 2021, President Biden announced a series of executive orders and administrative actions that would impose vaccine mandates on "100 million Americans – two thirds of all workers."[9]  That same day, President Biden issued Executive Order 14,043, which requires vaccination for all federal employees,[10] and Executive Order 14,042, requiring vaccination for all federal contractors.[11] On November 5, 2021, the Center for Medicare and Medicaid Services ("CMS") issued a mandate covering over 10 million healthcare workers.[12] Also on November 5, 2021, the Occupational Health & Safety Administration ("OSHA") issued an emergency temporary standard ("ETS") covering 80 million private sector employees.[13] Finally, on

---

[9] *See* President Joseph R. Biden, *Remarks by President Biden on Fighting the COVID-19 Pandemic* (Sept. 9, 2021), available at: https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (last visited Nov. 8, 2021) ("Biden Mandate Statement").

[10] *See* Exec. Order 14,043, 86 Fed. Reg. 50,989, "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees" (Sept. 9, 2021) ("Federal Employee Mandate").

[11]  *See* Exec. Order 14,402, 86 Fed. Reg. 50,985, "Ensuring Adequate COVID Safety Protocols for Federal Contractors" (Sept. 9, 2021) ("Federal Contractor Mandate").

[12] *See* CMS, Interim Final Rule, *Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61555-01 (Nov. 5, 2021) ("CMS Mandate").

[13] See OSHA, Interim Final Rule, COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) ("OSHA Mandate").

28

November 30, 2021, the Department of Health and Human Services ("HHS") issued a vaccine mandate for employees, contractors and children participating in the federal Head Start program.[14]

42.    These federal vaccine mandates have not fared well in the Courts. The OSHA Mandate was stayed nation-wide,[15] then withdrawn. The Federal Employee Mandate[16] and the Federal Contractor Mandate have also been stayed nation-wide.[17] The Head Start Mandate has been stayed in 25 states,[18] and the CMS Mandate remains stayed in 14 states.[19] Four of these mandates were stayed on the same grounds as Plaintiffs assert here, namely, that, the federal agencies or officials acted *ultra vires*, exceeding the authority delegated

---

[14] *See* HHS, *Vaccine and Mask Requirements to Mitigate the Spread of COVID-19 in Head Start Programs*, 86 Fed. Reg. 68,052 (Nov. 30, 2021) ("Head Start Mandate").

[15] *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661 (2022); *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ("*BST*").

[16] *See Feds for Medical Freedom v. Biden*, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022) ("*Feds for Medical Freedom*").

[17] *See Georgia, v. Biden*, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021) ("*Georgia*"); *see also State v. Nelson*, 2021 WL 6108948 (Dec. 22, 2021); *Kentucky v. Biden*, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021), *aff'd* 2022 WL 43178 (6th Cir. Jan. 5, 2021).

[18] *See Texas v. Becerra*, 2021 WL 6198109 (N.D. Tex. Dec. 31, 2021) ("*Texas*"); *Louisiana v. Becerra*, 2022 WL 16571 (W.D. La. Jan. 1, 2022).

[19] *See Louisiana v. Becerra*, 2021 WL 5609846 (W.D. La. Nov. 30, 2021), *modified* 20 F.4th 260 (5th Cir. Dec. 15, 2021) (limiting stay to the 14 plaintiff states). Although the Supreme Court dissolved the Fifth Circuit's stay pending appeal based on statutory grounds in *Missouri v. Biden*, 142 S. Ct. 647 (Jan. 13, 2022), the district court denied the motion to lift the stay for the 14 plaintiff states due to the substantial likelihood of success on the State plaintiffs' constitutional claims. *See Louisiana v. Becerra*, No. 3:21-cv-03970 (W.D. La. Jan. 18, 2022).

29

to them by the President and/or Congress.[20] Many of these courts further found

that the proposed justification for the rule in question was a pretext for the

real purpose, which was to cobble together unrelated agency authorities to

impose a nearly universal federal vaccine mandate and to maximize

vaccination rates.[21]

## II.    ARMED SERVICES GUIDANCE AND IMPLEMENTATION

43.    Each of the Armed Services have issued guidance implementing

the DOD Mandate.[22]  On September 14, 2021, Assistant Secretary of Defense

for Health Affairs Terry Adirim directed Armed Services Surgeons General

---

[20] *See, e.g., NFIB*, 142 S. Ct. at 665; *Feds for Medical Freedom*, 2022 WL
188329, at *5-6; *Georgia*, 2021 WL 5779939, at *9-10; *Texas*, 2021 WL 6198109, at
*7-8.

[21] *See, e.g., NFIB*, 142 S. Ct. at 666; *BST*, 17 F.4th at 616 (inferring that the purpose
of the OSHA Mandate is "to ramp up vaccine intake by any means necessary.");
*Georgia*, 2021 WL 5779939, at *9.

[22] *See generally* Ex. 7 Dept. of the Air Force, Deputy Director of Staff for COVID-19,
"COVID-19 Mandatory Vaccination Implementation Guidance for Service Members"
(Sept. 3, 2021) ("Air Force Guidance"); Ex. 8, Dept. of the Army, Fragmentary Order
5 to Headquarters Dept. of the Army Executive Order 225-21 (Sept. 14, 2021) ("Army
Guidance"); Ex. 9, MARADMIN, "Mandatory COVID-19 Vaccination of Marine Corps
Active and Reserve Components," MARADMINS Number: 462/21 (Sept. 1, 2021)
("Marine Corps Guidance"); MARADMIN, "Supplemental Guidance to Mandatory
COVID-19 Vaccination of Marine Corps Active and Reserve Components,"
MARADMINS Number: 533/21 (Oct. 7, 2021) ("MARADMIN 533/21") (collectively,
"Marine Corps Guidance"); Ex. 10, Secretary of the Navy, "2021-2022 Department of
Navy Mandatory COVID-19 Vaccination Policy," ALNAV 062/21 (Aug. 30, 2021);
"2021-2022 Navy Mandatory COVID-19 Vaccination and Reporting Policy,"
NAVADMIN 190/21 (Sept. 1, 2021) ("NAVADMIN 190/21"); "COVID-19 Consolidated
Disposition Authority," NAVADMIN 225/21 (Oct. 14, 2021) ("NAVADMIN 225/21")
(collectively, "Navy Guidance").

and DOD components that "health care providers ***should*** use doses distributed under the EUA to administer the vaccination as if the doses were the licensed [Comirnaty] vaccine."[23]

### A.    Religious Accommodation Requests and Appeals

44.    The DOD and each of the Armed Services have adopted guidance, procedures, and evaluation criteria for religious accommodation requests.[24] It would not be possible to provide a meaningful summary of these procedures; instead, Plaintiffs have attached Defendants' filings in the *Navy SEAL 1* Proceeding, which speak for themselves. Defendants appear to have approved zero requests (or 0.00%) for service members who will continue to serve, and they have approved about a dozen out of over 25,000 (or 0.05%) when those who are will be separating or on terminal leave are included. *See supra* note 2 (discussing findings in *Navy SEAL 1* and *Poffenbarger*).

---

[23] *See* Ex. 11, Terry Adirim, Asst. Sec. of Defense Memo to Surgeons General, *Mandatory Vaccination of Service Members Using the Pfizer-BioNTech COVID-19 and Comirnaty COVID-19 Vaccines* at 1 (Sept. 14, 2021) (emphasis added) ("Surgeons General Guidance"). The Air Force Guidance also expressly directs healthcare providers to use the EUA BioNTech Vaccine "interchangeabl[y]" with the licensed product and that "[p]roviders can use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine." Ex. 7, Air Force Guidance, ¶ 3.1.1; *see also id.*, ¶ 5.3.2.1 (same).

[24] *See generally* DOD Instruction 1300.17, "Religious Liberty in the Military Services" (Sept. 1, 2020) ("DODI 1300.17") (DOD-wide procedures); DAFI 52-201, "Religious Freedom in the Department of the Air Force" (June, 23, 2021) (Air Force); Army Regulation 600-20, "Army Command Policy" (July 24, 2020) (Army); BUPERSINST 1730.11A (Navy and Marine Corps)).

**Table 1: Religious Accommodation Requests & Appeals**[25]

| Armed Service | Initial RA Requests | | | RA Appeals | | |
|---|---|---|---|---|---|---|
| | Filed | Denied | Approved | Appeals | Denied | Approved |
| **Air Force** | 12,623 | 3,180 | 5 | 2,221 | 443 | 1 |
| **Army** | 3,523 | 391 | 0 | 55 | 0 | 0 |
| **Coast Guard** | 1,308 | 578 | 0 | 224 | 0 | 0 |
| **Marine Corps** | 3,539 | 3,458 | 0 | 1,150 | 119 | 3 |
| **Navy** | 4,095 | 3,728 | 0 | 1,222 | 81 | 0 |
| **Total** | **25,008** | **11,335** | **5** | **4,872** | **643** | **4** |

## B.    Medical and Administrative Exemptions

45.    While the Armed Services have categorically denied all or nearly all religious exemptions, they have granted thousands of medical and administrative exemptions. *See* Ex. 3, February 4, 2022 Compliance Notice.

**Table 2: Medical & Administrative Exemptions Granted**

| Armed Service | Medical Exemptions | | Administrative Exemptions | |
|---|---|---|---|---|
| | Permanent | Temporary | Permanent | Temporary |
| **Air Force** | UNKNOWN | 1,513 | 2,314 | |
| **Army** | 6 | 2,106 | NOT REPORTED | |
| **Coast Guard** | 4 | 6 | NOT REPORTED | |
| **Marine Corps** | 21 | 232 | 321 | 78 |
| **Navy** | 11 | 252 | 460 | 35 |

---

[25] Information in Table 1 and Table 2 is taken from Defendants' most recent compliance notice in the *Navy SEAL 1* Proceeding. *See* Ex. 3, February 4, 2022 Notice. The quantification and categorization of RAR and appeal requests and denials differ among the Armed Services. This table represents Plaintiffs' counsel's good faith effort to accurately and succinctly provide a summary of the data submitted by the Armed Services in the *Navy SEAL 1* proceeding.

C.    **Disciplinary Actions for Vaccine Refusal**

46.    The guidance provided by each of the Armed Services states that the requirement to be vaccinated is a "lawful order" and that any service members who refuses to take the vaccine will be subject to the full range of administrative and disciplinary actions under the UCMJ. *See* Ex. 7, Air Force Guidance, ¶ 5.3; Ex. 8, Army Guidance, ¶ 3.D.8.B & Annex 20; Ex. 9, Marine Corps Guidance, ¶ 3.1; Ex. 10, Navy Guidance, ¶ 5. Under the UCMJ, a service member who disobeys "any lawful general order or regulation," UCMJ § 892(2), Art. 92(2), faces sanctions up to a court-martial. UCMJ § 892. This punishment may include "dishonorable discharge, forfeiture of all pay and allowances, and confinement for 2 years." *Id.*

III.    **COMPARISON OF EUA TREATMENTS WITH FDA-LICENSED AND LABELED COVID-19 TREATMENTS**

A.    **FDA Emergency Use Authorization**

47.    Section 564 of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3, authorizes the FDA to issue an EUA for a medical drug, device, or biologic, where certain conditions have been met. As relevant here, these are that HHS Secretary has declared a public health emergency that justifies the use of an EUA, 21 U.S.C. § 360bbb-3(b)(1), and the FDA finds that "there is no [1] adequate, [2] approved, and [3] available alternative to the

33

product for diagnosing, preventing, or treating" the disease in question. 21 U.S.C. § 360bbb-3(c)(3).

48.    There are significant differences between licensed vaccines and those subject to an EUA that render them "legally distinct." Ex. 4, August 23, 2021 EUA Re-Issuance Letter, at 2 n.8. First, the requirements for efficacy are much lower for EUA products than for licensed products. EUAs require only a showing that, based on scientific evidence "if available," "it is reasonable to believe," the product "may be effective" in treating or preventing the disease. 21 U.S.C. §360bbb-3(c)(2)(A). Second, the safety requirements are minimal, requiring only that the FDA conclude that the "known and potential benefits … outweigh the known and potential risks" of the product, considering the risks of the disease. 21 U.S.C. §360bbb-3(c)(2)(B). Third, EUA products are exempt from certain manufacturing and marketing standards, enjoy broader product liability protections, and cannot be mandated due to informed consent laws and regulations.

**B.    Informed Consent Requirements for EUA Products**

49.    The FDA's grant of an EUA is subject to informed consent requirements to "ensure that individuals to whom the product is administered are informed" that they have "the option to accept or refuse administration of

the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).[26] For the three COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition described in Section 564(e)(1)(A)(ii)(III) in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient stating that the recipient or their caregiver "has the option to accept or refuse" the vaccine.[27]

### C.    FDA Licensing and Labeling Requirements

50.    The FDCA generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until the FDA has approved the drug or biological product as "safe, pure and potent," 42 U.S.C. § 262(a)(1)(C)(i)(II), where "potent" is considered by the FDA to include "effectiveness" as defined under the FDC Act. *See, e.g.*, 21 C.F.R. § 600.3(s). Pursuant to Section 351(a) of the PHSA, 42 U.S.C. § 262(a), the FDA has the authority to approve the sale

---

[26] The DOD may waive service members' informed consent rights to receive certain information regarding EUA products, provided that it complies with the requirements of 10 U.S.C. § 1107 (investigational new drugs) or 10 U.S.C. § 1107a (EUA products), including Presidential approval. The DOD has not requested or obtained Presidential approval for such a waiver. *See Austin*, 2021 WL 5816632, at *7.

[27] FDA, "Fact Sheet for Health Care Providers Administering Vaccine (Vaccination Providers); Emergency Use Authorization (EUA) of the Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)," at 13 (Jan. 31, 2022) ("Pfizer-BioNTech EUA Vaccine Fact Sheet"), available at: https://www.fda.gov/media/153713/download (last visited Mar. 1, 2022).

and manufacture of vaccines and other biologics like Pfizer-BioNtech's Comirnaty and Moderna's Spikevax. The FDA's approval of a biologics license application ("BLA") means not only that the FDA has found that the meets the PHSA's statutory requirements (safety, potency/efficacy, purity), but the BLA also addresses specific labeling and manufacturing requirements (including location, process, and storage requirements) that are not addressed in an EUA.

51.    The PHSA expressly prohibits the sale of any biologic product in interstate commerce unless the package is "plainly marked with" "the proper name of the biological product," (*e.g.,* Comirnaty or Spikevax) and "the name, address and applicable license number of the manufacturer." 42 U.S.C. § 262(a)(1)(B)(i)-(ii). These requirements are mandatory, not discretionary. *See* 21 C.F.R. § 610.60(a)(1)(2) (directing that the "proper name" and "license number" "shall appear on the label" of biological product); *see also* 21 C.F.R. § 207.37(a)(2) (a product is "deemed … misbranded" if labeling codes used to "denote or imply FDA approval of [an unapproved] drug"). While the FDA has discretion to make exceptions to labeling requirements, neither the FDA nor any other agency may waive any requirements "explicitly required by statute." *See, e.g.,* 21 C.F.R. § 610.68.

### D.    Comirnaty Approval and Pfizer EUA Re-Issuances

52.    On August 23, 2021, the FDA approved the May 18, 2021, Comirnaty application for individuals 16 years or older. The Comirnaty

36

Approval Letter approves the sale of Comirnaty Vaccine, as well as the specific manufacturing facilities, processes, ingredients, storage, and distribution requirements that were not addressed in the Pfizer-BioNTech EUA Letters.

53.    Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer-BioNTech Vaccine. *See* Ex. 4, Aug. 23, 2021 EUA Re-Issuance Letter. There, the FDA asserted that, while the EUA and licensed product were "legally distinct" "with certain differences," the two products "can be used interchangeably" because they have the "same formulation." *Id.* at 2 n.8. The FDA also stated that there "is not sufficient approved vaccine [i.e., Comirnaty] available" for the eligible population. *See id.* at 5 n.9. While the initial basis for the FDA's Interchangeability determination was that Comirnaty and the Pfizer-BioNTech EUA vaccine had the "same formulation," the FDA has subsequently abandoned that standard. The FDA now deems products that are both "legally distinct" and that have different formulations to be interchangeable, based on its finding that the legally and chemically distinct products are "analytically comparable."[28]

---

[28] *See* Ex. 5, Oct. 29, 2021 EUA Re-Issuance, at 3 (finding that Comirnaty with PBS buffer "can be used interchangeably" with EUA vaccines with PBS buffer and Tris buffer) & n.14 (defining "analytical comparability"); Ex. 6, Jan. 3, 2022 EUA Re-Issuance, at 12 (finding that Comirnaty with PBS or Tris buffers are interchangeable with EUA products with PBS or Tris buffer, *i.e.*, that four different products are mutually interchangeable).

54.     On September 13, 2021, the National Institutes of Health ("NIH") posted an announcement by Pfizer that Pfizer "does not plan to produce any product with these new [Comirnaty] NDCs and labels over the next few months while the EUA authorized product is still available and being made available for U.S. distribution." *See* Ex. 15, NIH-Pfizer Announcement of Comirnaty Unavailability.  The FDA has subsequently confirmed that Comirnaty remains unavailable in the United States on several occasions,[29] while Plaintiffs have repeatedly confirmed it has not been available since the inception of the mandate through the present.

### E.     Spikevax Approval and Moderna EUA Re-Issuance

55.     On January 31, 2022, the FDA approved Moderna's BLA for Spikevax. Also on the same date, the FDA re-issued the EUA for the Moderna COVID-19 vaccine, once again asserting that the "legally distinct" EUA and licensed versions "can be used interchangeably" because they have the "same formulation." Ex. 15, Jan. 31, 2022 Moderna EUA Re-Issuance, at 3 n.9. And once again, as with Comirnaty, the FDA noted that "there is not sufficient approved vaccine available" for the eligible population. *Id.* at 7 n.11.

---

[29] Ex. 14, Nov. 8, 2021 Comirnaty Summary Basis of Regulatory Action at 5 ("November 8 Comirnaty SBRA") ("In the U.S., there are no licensed vaccines or anti-viral drugs for the prevention of COVID-19."); Ex. 6, Oct. 29, 2021 EUA Re-Issuance Letter, at 9 n.17; Ex. 6, Jan. 3, 2022 EUA Re-Issuance Letter, at 10 n.19.

### F.    Differences Between EUA and Licensed Vaccines

56.    The FDA and Defendants have incorrectly asserted that the EUA BioNTech Vaccine and the conditionally approved Comirnaty Vaccine have the "same formulation" and can be used "interchangeably." Ex. 4, August 23, 2021 EUA Re-Issuance Letter, at 2 n.8.  However, there is no basis in law or in the publicly available record materials that the two admittedly "legally distinct" products are "interchangeable."

57.    There is no evidence in the public record for finding that the EUA and licensed products are the same, and ample evidence for finding that they are not. The most detailed information on Comirnaty's composition, manufacturing process, manufacturing locations and other matters approved by the FDA is included in the FDA Comirnaty SBRA, nearly all of which is redacted, *see* Ex. 13, August 23, 2021 Comirnaty SBRA, at 6-8, while most of this information was never made available in the Pfizer/BioNTech EUA applications or authorizations. To the extent such information is available, it reveals that there are differences in the composition of the EUA and licensed products.[30]  There   is   also   no   dispute   that   the   FDA   EUA   addressed

---

[30] *See Austin*, 2021 WL 5816632, at *3 n.5. *Compare* Ex. 13, Aug. 23 Comirnaty SBRA at 9 (listing 11 components, including .450 ml per vial of a redacted excipient), *with* Ex. 4, Aug. 23, 2021 EUA Re-Issuance Letter, at 7 (listing 10 components, all of which also appear on the Comirnaty SBRA) *and* Ex. 14, Nov. 8 Comirnaty SBRA, at 7-8 (listing 11 components, but removing .450 ml per vial of redacted excipient and replacing with unspecified amount of water as 11th component).

manufacturing processes or locations, which are solely addressed in the Comirnaty licensure. *See* Ex. 12, Aug. 23, 2021 Comirnaty SBRA, at 12-13. In any case, the FDA documents severely understate the complexities of the novel mRNA vaccines and nanolipid delivery systems, which Pfizer has stated include "more than 280 materials," rather than 10 or 11 disclosed in FDA filings, "made by suppliers in 19 countries."[31]

## IV. SCIENTIFIC EVIDENCE AND ADMINISTRATIVE ACTIONS FOR COVID-19 MRNA "VACCINES"

### A. Novel Technology with Insufficient Clinical Trial Data

58.    The Pfizer-BioNTech and Moderna COVID-19 treatments employ novel technology, namely, mRNA delivered by nanolipids. These products are considered "genetic vaccines" or "or vaccines produced from gene therapy molecular platforms."   Ex. 16, McCullough Decl., ¶ 17. As Dr. McCullough explains, the mRNA "vaccines" "have a dangerous mechanism of action in that they all cause the body to make an uncontrolled quantity of the pathogenic wild-type spike protein from the SARS-CoV-2 …. This is unlike all other vaccines where there is a set amount of antigen or live-attenuated virus." *Id.*

---

[31] Stephanie Baker & Vernon Silver, *Pfizer Fights to Control Secret of $36 Billion Covid Vaccine Recipe*, Bloomberg (Nov. 14, 2021), available at: https://www.bloomberg.com/graphics/2021-pfizer-secret-to-whats-in-the-covid-vaccine/ (last visited Feb. 28, 2022).

59.    Because of the novelty of gene therapies like mRNA, and the unknown safety risks, the FDA Gene Therapy Guidance advises "sponsors to observe subjects for delayed adverse events for as long as 15 years following exposure to the investigational gene therapy product." *Id.* (*quoting* FDA Gene Therapy Guidance at 4). The FDA's own guidelines make clear that the long-term safety risks cannot be known with any degree of certainty until recipients have been followed for 10 or more years, rather than six months.

60.    These mRNA treatments were only tested on humans for a limited period of time. For example, the Comirnaty Phase 2 and Phase 3 trials only covered the full sample for approximately two months, and a much smaller sample for up to six months. Moreover, the Comirnaty clinical trials expressly excluded individuals who have recovered from previous COVID-19 infections (*i.e.*, those with natural immunity). *See* Ex. 16, McCullough Decl., ¶ 47. Nor did they include participants from and/or provide sufficient data for other "special populations" such as pregnant or lactating women, those with autoimmune disorders or hematological conditions, children, and frail elderly populations. Accordingly, the long-term efficacy or long-term safety of these vaccines "is not proven." *Klaassen v. Trustees of Ind. Univ.,* --- F.Supp.3d. ---, 2021 WL 3073926, at *12 (N.D. Ind. July 18, 2021) (*"Klaassen"*).

**B.    Evidence of Rapidly Decreasing Efficacy or Obsolescence**

61.    According to Pfizer's CEO, "we know that the two doses of the vaccine" mandated by the DOD" offer very limited protection, if any," *see supra* YAHOO!Finance note 6, against the Omicron variant that accounts for nearly 100.0% of cases. The Pfizer Factsheet admits that Comirnaty's "duration of protection against COVID-19 is currently unknown." *See supra*, note 27, Pfizer-BioNTech EUA Vaccine Fact Sheet at 4.  What is known, however, is that recent studies indicate that the efficacy and protection of the BioNTech Vaccine drops off significantly over time, particularly after the six-month period on which the FDA relied in conditionally approving the Comirnaty Vaccine.

62.    Even before the FDA approved Comirnaty, studies from Israel found that the Pfizer-BioNTech vaccine's effectiveness decreased from over 90% to 39% after six months for infections and 40.5% for symptomatic cases.[32] A November 4, 2021 study published in *Science*, which examined the Veterans

---

[32]    *See* Israel Ministry of Health Presentation (July 23, 2021), available at: https://www.gov.il/BlobFolder/reports/vaccine-efficacy-safety-follow-up-committee/he/files_publications_corona_two-dose-vaccination-data.pdf (last visited Feb. 28, 2022); Rory Jones & Dov Lieber, *Pfizer COVID-19 Vaccine Is Less Effective Against Delta Infections but Still Prevents Serious Illness, Israel Study Suggests*, WALL STREET J. (July 23, 2021), available at: https://www.wsj.com/articles/pfizer-covid-19-vaccine-is-less-effective-against-delta-infections-but-still-prevents-serious-illness-israel-study-shows-11627059395 (last visited Feb. 28, 2022).

Health Administration ("VHA") records 780,000 U.S. veterans,[33] found that from February 2021 to October 2021, the vaccine effectiveness against infection (VE-I) declined from 87.9% to 48.1% overall and 43.3% for the Pfizer-BioNTech vaccine).

63.    Defendants may claim that they have relied on CDC recommendations in imposing the mandate. Yet the DOD and Armed Services have ignored the November 19, 2021 CDC/ACIP unanimous recommendation that all eligible adults receive the third shot of the booster,[34] due to the rapidly declining effectiveness of the vaccine. Neither the DOD nor the Armed Services have provided any explanation for why they followed the CDC recommendation for a two-dose regimen, but ignored it for the third booster shot.

## C.    Vaccine Injuries and Side Effects

64.    The VAERS data reveal unprecedented levels of death and other adverse events since the FDA issued EUAs for the three COVID vaccines. The total safety reports in VAERS for all vaccines per year up to 2019 was 16,320. By comparison, the total VAERS safety reports for COVID-19 Vaccines "alone

---

[33] *See* Barbara Cohn, et al., *SARS-CoV-2 Vaccine Protection and Deaths Among Veterans During 2021,* SCIENCE (pre-print) (Nov. 4, 2021) ("VHA Study"), available at: https://www.science.org/doi/epdf/10.1126/science.abm0620 (last visited Feb. 28, 2022).

[34] *See* CDC, *CDC Expands Eligibility for COVID-19 Booster Shots to All Adults,* CDC Media Statement (Nov. 19, 2021), available at: https://www.cdc.gov/media/releases/2021/s1119-booster-shots.html.

through October 1, 2021, is 778,683." Ex. 16, McCullough Decl., ¶ 27. Through October 1, 2021, this included "16,310 COVID-19 vaccine deaths … and 75,605 hospitalizations," *id.* and "98% of all vaccine-related AEs from December 2020" through October 1, 2021. *Id.*, ¶ 28. "Thus, the COVID-19 mass vaccinationis associated with at least a 39-fold increase in annualized vaccine deaths reported to VAERS." *Id.*, ¶ 27.

65.    The increased risks due to COVID-19 vaccine was underscored earlier this month where Senator Ron Johnson held a roundtable with DOD whistleblowers and military doctors to discuss information obtained from the Defense Medical Epidemiology Database ("DMED") database. The DMED data showing that diagnoses of serious cardiovascular diseases, neurological disorders and certain cancers had increased anywhere from 300% (3x) to 2,000% (20x) in 2021, when vaccinations started, compared to the five-year average for 2016-2020. *See* Ex. 17, Sen. Ron Johnson Letter to Secretary of Defense Lloyd Austin, III (Feb. 1, 2022).

66.    Further, the COVID-19 vaccines are "dangerous for those who have already had COVID-19 and have recovered with inferred robust, complete, and durable immunity," Ex. 16, McCullough Declaration, ¶ 47, who were inexplicably and inexcusably excluded from the FDA-approved clinical trials for the COVID-19 vaccines. Thus, "[t]here has been no study

demonstrating clinical benefit with COVID-19 vaccination in those who have well documented or even suspected prior COVID-19 illness." *Id.* There have, however, been numerous studies demonstrating that the those with previous infections have suffered greater risks of adverse reactions from the vaccines, as well as a greater rate and severity of subsequent COVID-19 infections than those with previous infections who remained unvaccinated. *See id.*, ¶¶ 49-51 & studies cited therein.

### D.    Vaccination Does Not Prevent COVID-19 Transmission.

67.    DOD data discussed in the *Navy SEAL 1* hearing and available on the DOD's website show that between November 24, 2021, and December 22, 2021, the month during which vaccines became mandatory, the "military total of new COVID-19 cases rose by 7,515 cases but between December 22, 2021 and February 9, 2021, after vaccination was mandatory and after each branch reported greater than 90% vaccination rates, cases rose" over 15-fold to "114,292 cases."[35]

68.    Moreover, the weight of currently available evidence indicates that vaccinated and unvaccinated persons spread COVID-19 at approximately the same rates.  A study by the UK National Institute for Health Research,

---

[35] *Navy SEAL 1*, at *18 n.11 (*citing* DOD, Corona-virus: DOD Response, available at: https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (data as of Nov. 24, 2021, Dec. 22, 2021, and Feb. 9, 2022)).

published in *The Lancet* on October 28, 2021, of the rate of household spread of the Delta variant "among household contacts exposed to fully vaccinated index cases was similar to household contacts exposed to unvaccinated index cases (25% [95% CI 15-35] for vaccinated vs. 23% [15-31] for unvaccinated."[36] Accordingly, "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts." *Id.*

69.    A September 29, 2021 preliminary report from the University of California, Davis, Genome Center found that "[t]here were no statistically significant differences in mean [cycle threshold] Ct-values of vaccinated … vs. unvaccinated … samples."[37]   There were also "no statistically significant differences were found in the mean Ct-values of asymptomatic … vs. symptomatic … samples, overall or stratified by vaccine status."  *Id.*

70.    A July 2021 CDC study of an outbreak in Massachusetts found

---

[36] See Anika Singanayagam, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study (Findings)*, THE LANCET (Oct. 29, 2021), https://doi.org/10.1016/S1473-3099(21)00648-4, available at: https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext#seccestitle160 (last visited Feb. 28, 2022).

[37] See Charlotte B. Acharya, et al., *No Significant Differences in Viral Load Between Vaccinated and Unvaccinated, Asymptomatic and Symptomatic Groups Infected with SARS-CoV-2 Delta Variant*, medRxiv Pre-Print (Sept. 29, 2021), https://doi.org/10.1101/2021.09.28.21264262, available at: https://www.medrxiv.org/content/10.1101/2021.09.28.21264262v2 (last visited Nov. 8, 2021).

that the vast majority of cases were reported among the vaccinated.[38] The VHA Study discussed above also found that, with respect to the Delta variant, viral loads are similar for both vaccinated and unvaccinated. *See supra* VHA Study, note 33, at 3.

### E.    Quarantine & Testing Provide Equal or Greater "Protection."

71.    In Dr. McCullough's expert medical opinion, "the epidemic spread of COVID-19, like all other respiratory viruses, notably influenza, is driven by symptomatic persons; asymptomatic spread is trivial and inconsequential." Ex. 14, McCullough Decl., ¶ 10. A meta-analysis published in the *American Journal of the American Medical Association* concluded that "asymptomatic spread was negligible at 0.7%."[39] Consequently, "a rational and ethical prevention measure to reduce the spread of COVID-19 is a simple requirement" would be for persons with "active symptomatic, febrile (feverish) respiratory illnesses … to isolate themselves." *Id.*, ¶ 11. Thus quarantine and testing, the previous COVID-19 mitigation strategy, can provide equal or

---

[38] See Ex. 16, McCullough Decl., ¶ 25 & Figure 1 (*citing* CDC, Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts, July 2021, CDC Morbidity and Mortality Weekly Report (Aug. 6, 2021).

[39] *Id.*, ¶ 11 (*citing* Zachary J. Madewell, Ph.D., et al., *Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis*, JAMA Network Open, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774102 (last visited Oct. 23, 2021)).

greater protection, at much lower costs to society, the DOD, and the individuals involved, than mass vaccination. Several plaintiffs proposed similar alternative and less restrictive means in their RARs and/or appeals. *See infra* ¶ 85 (summarizing Plaintiffs' proposed less restrictive means).

### F.    Natural Immunity Provides Superior Protection to Vaccination.

72.    Numerous studies (described below) demonstrate the superiority of natural immunity over vaccine-induced immunity (or "protection" in CDC's new terminology). In Dr. McCullough's expert opinion, "SARS-CoV-2 causes an infection in humans that results in robust, complete, and durable immunity, and is superior to vaccine immunity." *Id.*, ¶ 53. "There are no studies demonstrating the clinical benefit of COVID-19 vaccination in COVID-19 survivors and there are three studies demonstrating harm in such individuals. Thus, it is my opinion that the COVID-19 vaccination is contraindicated in COVID-19 survivors." *Id.* Dr. McCullough discusses a study of 615,777 previously infected individuals, which found a re-infection rate of less than one percent (<1%) over the long term (including periods where the Delta variant is dominant).[40]    A number of recent court decisions have acknowledged that

---

[40] *See* Ex. 16, McCullough Decl., ¶ 56 (*discussing* Eamon O Murchu, et al., *Quantifying risk of SARS-CoV-2 reinfection over time,* Reviews in Medical Virology (May 27, 2021), available at: https://onlinelibrary.wiley.com/doi/10.1002/rmv.2260 (last visited Oct. 23, 2021)).

significant scientific evidence demonstrating the efficacy of natural immunity, and have questioned the Defendants' refusal to consider service members' natural immunity in ruling on their religious exemption requests and as part of the proposed less restrictive means analysis. *See, e.g., Navy SEAL 1*, at *16 & n.10; *Navy SEALs 1-26*, at *10; *Air Force Officer*, at *10.

## G.    Alternative and Effective Treatments for COVID-19

73.    There are now well-studied, safe and reliable alternatives to vaccination for prevention and treatment of COVID-19, including, but not limited to Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids, monoclonal antibodies, and other accessible therapies. Merck recently announced a new COVID-19 treatment, an oral antiviral pill that dramatically reduces risks of hospitalization and death.[41]

74.    Dr. McCullough has studied—and developed through his work with the Association of American Physicians and Surgeons—a number of alternative treatments. The treatment approach outlined in his declaration "has resulted in an ~85% reduction in hospitalization and death in high-risk individuals" with COVID-19, and results in "less than 2% change of facing

---

[41] *See, e.g.,* Robert F. Service, *"Unquestionably a Game Changer!" Antiviral Pill Cuts COVID-19 Hospitalization Risk*, SCIENCE (Oct. 1, 2021), available at: https://www.science.org/content/article/unquestionably-game-changer-antiviral-pill-cuts-covid-19-hospitalization-risk (last visited Feb. 28, 2022).

hospitalization or death among high-risk adults (age over 50 with medical problems). Ex. 16, McCullough Decl., ¶¶ 12-13 & Table 3. These hospitalization and death rates would necessarily be lower for younger, healthier service members.

75.     Further, in light of the CDC's changing definition of vaccines and vaccination to provide only "protection," rather than "immunity" (*i.e.*, because COVID-19 vaccines do not provide immunity), the numerous alternative treatments that do provide protection (as well as natural immunity) should be considered as alternative methods to meet the CDC's public health goals, and the DOD's exclusion of these alternatives is irrational and unsupported.

## V.     PLAINTIFFS RELIGIOUS ACCOMMODATION REQUESTS

### A.     Plaintiffs' Sincerely Held Religious Beliefs

76.     In their declarations and the religious accommodation requests attached thereto ("RA Requests"), Plaintiffs have set forth the sincerely held religious beliefs that compel them to oppose the mandate. The primary reason cited is the refusal to participate in the abomination of abortion. *See, e.g.,*Dee Decl., RA Request, ¶ 5 ("any support for or acceptance of a product that is produced using aborted human fetal tissue goes against my sincerely held belief that voluntary termination of a pregnancy is murder and a violation of God's commandments."); Hyatt Decl., at ¶ 8 ("The use of cells, cellular debris, protein and DNA from willfully aborted human children cell lines used to

develop the Covid-19 vaccine violate the very basic foundations of Exodus 20:13, which instructs us not to murder."); Bongiovanni Decl., ¶ 7; Hamilton Decl., ¶ 8; Kins Decl., ¶ 7; Macie Decl., ¶ 9; Montoya Decl., ¶ 6; Nykun, ¶ 11; Poehler Decl., ¶ 7; Singletary Decl., ¶ 7.

77.    Certain Plaintiffs also object to the use of gene therapies like the COVID-19 treatments that alter God's creation, *i.e.*, their genetic codes or immune system, in violation of God's commandments. *See, e.g.,* Dee Decl., RA Request, ¶ 1 ("God created me perfectly and in His image."); Caldwell Decl., ¶ 13 ("my body is God's Temple and, through my perfectly designed immune system, I am natural immune" and "forced or coerced inoculation with a substance that I believe I am prohibited from allowing into my body, … is a sin against God"); Bongiovanni Decl., ¶ 7 ("Corinthians 6:19-20 says, 'Or do you not know your body is a temple of the Holy Spirit within you, whom you have from God? You are not your own, for you were bought with a price. So glorify God in your body.'"); Dyal RAR, ¶ 2; Kins Decl., ¶ 7; Montoya Decl., ¶ 6; Nykun Decl., ¶ 7; Poehler, ¶ 7.

78.    Plaintiffs also believe that the mandate is forcing them to choose between God and country and/or following an unlawful and unethical order. *See, e.g.,* Bongiovanni Decl., ¶ 7 ("This is ultimately putting us in a situation that forces us to decide which law we must follow: God's law or man's law?");

Dee Decl., ¶8 ("the Navy guidelines for implementing the mandate provided no recognition of informed consent [or] the right to refuse an EUA product … Given the risks [associated with compliance compared to] the low risk to our military-aged population from contracting COVID-19, I could not in good conscience, force them to take a product I believed would do more harm than good."); Freincle Decl., ¶7 ("Receiving a [COVID 19] vaccination post [COVID] could possibly exacerbate that condition.").

**B.    COVID-19 Vaccines Are Critically Dependent on, and Could Not Exist but for, the Use of Aborted Fetal Cell Tissue.**

79.    It is undisputed that HEK-293 and PER.C6 fetal cell lines were used in the development and testing of the three (3) available COVID-19 vaccines. As reported by the North Dakota Department of Health, in its handout literature for those considering one of the COVID-19 vaccines, "[t]he non-replicating viral vector vaccine produced by Johnson & Johnson did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine."[42] The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus

---

[42] *See* North Dakota Health, *COVID-19 Vaccines & Fetal Cell Lines* (Oct. 5, 2021) ("NDH                      FAQ"),                      available                      at: https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/ COVID-19_Vaccine_Fetal_Cell_Handout.pdf (last visited Nov. 15, 2021).

in 1985."[43]

80.    The same is true of the Moderna and Pfizer-BioNTech mRNA vaccines. The Louisiana Department of Health's publications again confirm that aborted fetal cells lines were used in the "proof of concept" phase of the development of their mRNA vaccines. *See id.* The North Dakota Department of Health likewise confirms: "Early in the development of mRNA vaccine technology, fetal cells were used for 'proof of concept' (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein." *See* NDH FAQ. Multiple Pfizer executives have confirmed both that aborted fetal cells were critical for development, while at the same trying to cover this up this essential fact.[44]

### C.    Plaintiffs' RARs and Appeals Have Been Denied with "Magic Words," Rather Than Individualized Assessments.

81.    With the exception of SFC Freincle, every Plaintiff has had their initial RAR request denied, and in many cases, their appeals as well, including

---

[43] La. Dept. of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), available at: https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (last visited Nov. 15, 2021).

[44] See Project Veritas, PFIZER LEAKS: Whistleblower Goes On Record, Reveals Internal Emails from Chief Scientific Officer & Senior Director of Worldwide Research Discussing COVID Vaccine ... 'We Want to Avoid Having the Information on the Fetal Cells Floating Out There', (Oct. 6, 2021), available at: www.projectveritas.com/news/pfizer-leaks-whistleblower-goes-on-record-reveals-internal-emails-from-chief/ (last visited Feb. 8, 2022).

Plaintiffs Bongiovanni, Caldwell, Harwood, Kins, Mazure, Montoya, Nykun. Moreover, Defendants have "rubber stamped" denials on Plaintiffs RAR requests and/or appeals using the same "magic words," formulaic language, and theoretical speculation, without any individualized evaluation "to the person" required by RFRA or consideration of mission impact required by service regulations.

82. **Compelling Governmental Interest.** With respect to the asserted compelling governmental interest, the RAR and appeal denial letters simply recite the same set of interests, in particular: (1) "preventing the spread of disease;" and/or (2) some sequence of military readiness, unit cohesion, and good order and discipline with slight variations by letter or service. *See, e.g.,* Bongiovanni Appeal Denial, ¶ 1; Caldwell Appeal Denial, ¶ 2; Dyal RAR Denial, ¶ 2; Hamilton RAR Denial, ¶ 3.

83. The denial letters also appear to rely on impermissible criteria prohibited by RFRA, in particular, "the cumulative impact of granting similar requests." Dyal RAR Denial, ¶ 3; *see also* Mathis RAR Denial, ¶ 4 (rejecting requests based on "cascading effects on the entire Coast Guard"). Or they are based on pretextual, impermissible, and completely unsupported claims that granting the request would endanger the general public. *See, e.g.,* Dyal RAR Denial, ¶ 3; Mathis RAR Denial ¶¶ 3-5; Poehler RAR Denial, ¶¶ 3-5. Certain

54

denial letters even go as far as asserting that service members unvaccinated for religious reasons pose a threat to others who are unvaccinated for secular reasons, supporting the conclusion that Defendants deem those unvaccinated for religious reasons to be uniquely dangerous. *See, e.g.,* Dyal RAR Denial, ¶ 3 ("…there is a risk that you will contract a communicable disease…and put other[s]…at risk who have been administratively or medically exempt from certain vaccinations"); Harwood RAR Denial, ¶ 6 (unvaccinated status "risk[s] the health and medical readiness of other persons within their unit").

84.    **Least Restrictive Means.** The discussion of "less restrictive means" is even more formulaic, and in most cases consists of a single conclusory assertion that "'vaccination is the least restrictive means." *See e.g.*, Bongiovanni Appeal Denial, ¶ 1; Harwood Appeal Denial, ¶ 3; Kins Appeal Denial, ¶ 1; Nykun Appeal Denial, 1; McAfee Request Denial, ¶ 2.

85.    Several plaintiffs proposed alternative, less restrictive means and provided evidence that these alternatives had been employed successfully over the past two years by the commander, unit, or vessel while achieving mission objectives and limiting the spread of COVID-19. *See, e.g.,* Mazure Decl., ¶ 8 (describing how he had "provided instruction to over 2,500 personnel between March 16th to December 2021 without vaccination and zero cases of COVID being traced to our training"); McAfee Decl., ¶ 14 (described how there was zero

55

community spread at his unit and 100% mission effectiveness through all COVID until November 2021 after mass vaccination when cases soared and discriminatory testing was coincidentally implemented); Montoya Decl., ¶ 12 (described how mission successfully completed from 2020 to present using less restrictive alternatives). The denial letters either failed altogether to mention proposed alternatives, or dismissed them without any discussion or explanation. *See* Mazure Appeal Denial; McAfee RAR Denial; Montoya Appeal Denial. Moreover, not a single RAR denial letter recognizes natural immunity, physical fitness, diet, and natural supplements, or early treatment as alternative mitigation measures.

86.    The denial letters failed altogether to consider the Armed Services' affirmative obligation to provide accommodation, or to consider even minimal changes to the workspaces over which the Armed Services control. For example, several denial letters cited the need to work with classified information in close quarters or proximity as the reasons that no less restrictive means were feasible. *See, e.g.,* Caldwell Appeal Denial; Hamilton RAR Denial, ¶ 3; Harwood Appeal Denial, ¶ 6; Poehler RAR Denial, ¶ 4. These are "highly controlled and regulated environments, as a matter of national security," and the Armed Services have "the discretion to set these spaces up in a way that allows for social distancing or physical barriers between

individual workstations." Hamilton Decl., ¶ 31. The denial letters also fail to explain why the current requests for accommodation are different from previous accommodations that had been granted. *See, e.g.,* Hamilton Decl., ¶ 32 (explaining how the Air Force has granted religious and non-religious accommodations for dietary preferences, clothing, high-risk activities, and gender-preference-based therapies). Nor is an honorable discharge without disciplinary action or misconduct codes considered as an alternative to vaccination. *See, e.g., Poffenbarger*, 2022 WL 594810, at *14 (identifying honorable discharge as a less restrictive means).

87.    In many cases where denial letters attempt to tie a Plaintiff's specific roles or duties to the conclusion reached, the denials are based on incorrect factual assumptions that can be easily refuted. *See, e.g.,* Caldwell Appeal Denial, ¶ 10 (citing need for vaccination to be deployable, despite the fact that MSGT Caldwell has never deployed); Hamilton Decl., ¶ 11 (describing how RAR denial incorrectly concluded that social distancing was not possible in his workspace); Macie RAR Denial, ¶ 5.b (denying RAR based on threat posed by working in "close proximity with your shipmates" for a shore-based position).

88.    Defendants' dismissive treatment of Plaintiffs request to accommodate their sincerely held religious beliefs is consistent with their

treatment of tens of thousands of other service members. The statistics provided in the *Navy SEAL 1* Proceeding show that Defendants have granted zero religious accommodation requests, while denying over ten thousand. *See supra* Table 1, while the only requests granted to date appear to be for those who are separating or on terminal leave (*i.e.*, no accommodation at all). These statistics demonstrate that (1) submissions of religious accommodation requests are futile and (2) that the DOD and Armed Services are systematically denying these requests, in violation of their statutory obligations and the constitutional rights of Plaintiffs.

## VI. PLAINTIFFS WILL SUFFER CONCRETE AND PARTICULARIZED HARM FROM DEFENDANTS' ACTIONS

89.    Plaintiffs have real, substantial, and legitimate concerns about taking experimental COVID-19 treatments in light of and the potential for short- and long-term side effects and adverse reactions. All Plaintiffs (except for SFC Freincle) have also been denied RARs under new illegal and unconstitutional criteria. *See* Section V.C ("Plaintiffs' RARs and Appeals Have Been Denied"). In addition to religious accommodation, Plaintiffs have also pursued other military administrative remedies including complaint under Article 138 of the UCMJ challenging the lawfulness of the order, Equal Opportunity complaints challenging religious discrimination and retaliation, complaints filed with the DOD or Armed Services Inspector Generals, and

congressional inquiries. *See, e.g.,* McAfee Decl., ¶ 13; Hyatt Decl., ¶ 7; Singletary Decl. ¶ 10.

90.    All Plaintiffs will face adverse employment or disciplinary actions, up to and including termination, separation, dishonorable discharge, court martial, loss of post-separation benefits, and permanent damage to their reputation and employment prospects resulting from a court martial and/or dishonorable discharge. *See supra* Section II.C ("Disciplinary Actions for Vaccine Refusal").

91.    This is not a theoretical or speculative harm. Plaintiffs have already suffered severe adverse employment, administrative and disciplinary actions. Several Plaintiffs are in the process of involuntary separation or dismissal and will soon face a Board of Inquiry to determine their discharge status or other disciplinary proceedings. *See* Caldwell Decl., ¶ 11; Dee Decl., ¶ 7; Freincle Decl., ¶¶ 12-13; Kins Decl., ¶ 14; Mazure Decl., ¶ 12; Montoya Decl., ¶ 10. Several Plaintiffs have been relieved of command or other senior positions, and/or been reassigned to lower positions, due to their vaccination status. *See* Dee Decl., ¶ 7 (forced to resign command and commence DFC proceedings); Hamilton Decl., ¶ 10 (selection to lead squadron cancelled); Harwood Decl., ¶¶ 6-7 (removed as battalion XO and reassigned); Kins Decl., ¶ 4 (removed as XO of USS WINSTON S. CHURCHILL (DDG-81) due to

59

objections to lawfulness of mandate and consequent discriminatory testing regime); McAfee Decl., ¶ 8 (removed from senior instructor position at National Defense University); Montoya Decl., ¶ 10 (removed as XO of PCU HYMAN G. RICKOVER (SSN 795)). Certain Plaintiffs have received one or more letters of reprimand, a General Officer Letter of Reprimand ("GOMOR"), or other paperwork that will adversely affect their discharge status. *See, e.g.,* Davis Decl., ¶¶ 6 & 12; Freincle Decl., ¶¶ 12-13; Macie Decl., ¶ 12.

92.    Other Plaintiffs are facing severe training, duty and travel restrictions, which prevents them from performing their current duties, training to maintain qualifications for their current positions, qualifying for promotion, or moving to new duty stations. *See* Mazure Decl., ¶ 13 (training and travel restrictions may result in loss of instructor qualifications); Poehler Decl., ¶ 13 (lost flight status due to training and travel restrictions). In addition, Plaintiffs will also face substantial losses in terms of lost pay and benefits due to separation, dismissal and early retirement. *See, e.g.,* Bongiovanni Decl., ¶ 13 (may have to repay USNA tuition at a cost of up to $100,000); Dee Decl., ¶ 10 (estimated lost pay and benefits potentially in excess of $500,000); Macie Decl., ¶ 14 (estimated lost pay and benefits in excess of $1,500,000); Mazure Decl., ¶ 14 (estimated lost pay and benefits in excess of

$900,000); McAfee Decl., ¶ 14 (estimated loss of pay and benefits from $1,750,000).

93.    Further, Plaintiffs have objected to the mandate based on the unavailability of any FDA-licensed vaccines, the subsequent requirement to take a non-FDA-licensed EUA vaccines, and/or the fraudulent misrepresentation of non-FDA-licensed EUA vaccines as FDA-licensed vaccines. *See, e.g.,* Freincle Decl., ¶ 9-11; Hamilton Decl., ¶ 27; McAfee Decl. ¶¶ 15 & 24; Poehler Decl. ¶ 10. As a result, they received disciplinary action as precursor to involuntary separation for their refusal to take a non-FDA-licensed vaccine. *See, e.g.,* Dee Decl., ¶ 8 (forced to resign command due to unwillingness to transmit unlawful order to sailors under his command to take an unlicensed vaccine); Hyatt Decl., ¶ 7 (willing to take an FDA-licensed vaccines, but not unlicensed EUA vaccine); Kins Decl., ¶ 13 (given Article 15 NJP for challenging lawfulness of order to take EUA vaccine and consequent discriminatory testing regime). Defendants have a long history of ignoring and violating service members' informed consent rights as they seek to do here, and it is the role of federal courts to protect service members' rights just as the protect ours: "the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." *John Doe #1 v. Rumsfeld*, 297 F.Supp.2d 119, 135 (D.D.C. 2003). The injury is exacerbated by

the fact that the government not only seeks to deprive them of their informed consent rights both through deception and coercion, but also to take their freedom and livelihoods for having the temerity to exercise the rights granted to them by statute and the U.S. Constitution.

**FIRST CAUSE OF ACTION**
**VIOLATION OF RELIGIOUS FREEDOM RESTORATION ACT**
**42 U.S.C. § 2000bbb, *et seq.***

94.    Plaintiffs reallege the facts in Paragraphs 1 through 93 as if fully set forth in this Count.

95.    RFRA was enacted "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014) ("*Burwell*"). "Congress mandated that this concept be 'construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" *Burwell*, 134 S. Ct. at 2762 (*quoting* 42 U.S.C. § 2000cc-3(g)).

96.    RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). The government burdens religion when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981), or "prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief." *Davila v. Gladden*, 777 F.3d

62

1198, 1204 (11th Cir. 2015) (citation and quotation omitted). "That is especially true when the government imposes a choice between one's job and one's religious belief," *Navy SEALs 1-26*, at *9 (*citing Sherbert v. Verner*, 374 U.S. 398 (1963)).

97.    If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden ***to the person*** – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added). This means that strict scrutiny must be satisfied both for the "the asserted harm of granting specific exemption to particular religious claimants," and of "the marginal interest in enforcing the challenged government action in that particular context." *Burwell*, 573 U.S. at 726-27. *See also O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) ("*O Centro*") (the Government must "demonstrate that the compelling interest is satisfied through the application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened").

98.    "RFRA expressly creates a remedy in district court," *Navy SEAL 1*, 2022 WL 534459, at *13, granting a "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense

in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

99. RFRA applies to Defendants, as they constitute a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1). Further, "RFRA includes no administrative exhaustion requirement and imposes no jurisdictional threshold. No exemption, whether … express or implied, insulates the military from review in the district court." *Navy SEAL 1*, at *13.

100. Defendants have substantially burdened Plaintiffs' free exercise rights because the mandate forces Plaintiffs to "decide whether to lose their livelihoods or violate sincerely held religious beliefs." *Navy SEALs 1-26*, at *9. "By pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiffs' free exercise of religion." *Navy SEALs 1-26* Stay Order, 2022 WL 594375, at *9.

101. Defendants' religious exemption regulation, and implementation thereof, is neither neutral nor generally applicable because it treats comparable secular activity—medical and administrative exemptions—more favorably than religious exemptions. As shown in Table 1 above, *see supra* Section II.A ("Religious Accommodation Requests and Appeals"), out of roughly 25,000 RARs, somewhere between 0.00% and 0.03% (*i.e.*, eight of over 25,000,

64

and those appear to have been granted only to service members separating from the service), while on the other hand, Table 2 shows that thousands of medical and administrative exemptions have been granted. *See supra* Section II.B ("Medical and Administrative Exemptions").

102. Plaintiffs have presented *prima facie*—and undisputable—evidence that Defendants have substantially burdened their exercise of religion, which triggers strict scrutiny where the government bears the burden of proving that its policies satisfy strict scrutiny. *O Centro*, 546 U.S. at 429. "Because the mandate treats those with secular exemptions more favorably than those seeking religious exemptions, strict scrutiny is triggered." *Navy SEALs 1-26*, at *9. RFRA thus presents a "high bar" to justify substantially burdening free exercise, and "[t]his already high bar is raised even higher [w]here a regulation already provides an exception from the law for a particular group." *Navy SEALs 1-26* Stay Order, at *10 (citations and internal quotations omitted). Defendants fail to meet this high bar for either of the two prongs of the strict scrutiny analysis.

103. While "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Cuomo*, 141 S. Ct. at 67, "its limits are finite." *Navy SEALs 1-26*, at *10. The government cannot rely on "broadly formulated interests," like "public health" or "military readiness," and must justify its

decision by "scrutinize[ing] the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27.

104. Defendants' "broadly formulated interest in national security," *Navy SEALs 1-26*, at *10, will not suffice. Nor will simply invoking "magic words" like "military readiness and health of the force." *Navy SEAL 1*, at *17 (*quoting Davila*, 777 F.3d at 1206). Instead, Defendants must produce "record material demonstrating that the military considered both the marginal increase, if any, in the risk of contagion incurred by granting the requested exemption and the marginal detrimental effect, if any, on military readiness and the health of the force flowing from the … denial" of the specific Plaintiff's exemption request. *Navy SEAL 1*, at *15.

105. As in *Navy SEAL 1*, Defendants have manifestly failed to demonstrate that they have a compelling governmental interest in denying Plaintiffs' RARs and appeals. Instead, they have relied on "magic words" to "rubber stamp," *see Navy SEAL 1*, *18, in their blanket denials of Plaintiffs' RAR and appeal denial letters, *see supra* ¶¶ 82-83 (summarizing formulaic and deficient analysis in Plaintiffs' RAR and appeal denial letters), just as they have tens of thousands of other service members. *See supra* Table 1.

106. Nor have Defendants demonstrated that their blanket denials of Plaintiffs' religious exemptions are the least restrictive means of furthering

66

that interest. These letters both ignore Defendants' own successful use of alternatives to vaccination over the past two years (e.g., masking, testing, quarantine, social distancing), but also those proposed by Plaintiffs that are specifically adapted to their specific role, unit, vessel, or mission and the evidence presented by that these measures have enabled them to successfully perform their missions and roles without vaccination. *See supra* ¶ 85. Similarly, Defendants' assertions that no less restrictive means than vaccination exists because alternative, less restrictive measures "are not 100 percent effective," *see e.g.,* Bongiovannia Appeal Denial ¶ 4, similarly cannot satisfy strict scrutiny because this "statement [is] equally true of vaccination." *Navy SEAL 1*, *18 & n.10.

107.   Further, several Plaintiffs have documented previous COVID-19 infections from which they have fully recovered, in many cases, quite recently. Such natural immunity from previous infections provides stronger and longer-lasting protection than the vaccines. *See supra* Section IV.F ("Natural Immunity Provides Superior Protection "). Moreover, several Plaintiffs have proposed alternative mitigation measures consistent both with those that have been successfully practiced over the last two years since COVID-19 emerged. *See supra* ¶ 84. For example, Plaintiffs could be subject to regular COVID-19

testing, masking, social distancing, along with isolation or quarantine for positive tests, as they have been for over a year. *See supra* Paragraph 71.

108.  Yet, the Defendant's denial letters dismiss natural immunity—"reaching disputed medical conclusions without evaluation or citation of medical or legal authority," *Navy SEAL 1*, at *16 & n.10—combined with Plaintiffs' proposed less restrictive alternatives that have been successfully employed in the past without acknowledgement or discussion. *See id.* at *18-19. Just as in *Air Force Officer*, Defendants' conclusory assertions fail to show that "COVID-19 vaccine[s] … provide more sufficient protection" than Plaintiffs' "natural immunity coupled with other preventive measures," nor have they shown "vaccination is actually necessary by comparison to alternative measures[ ], since the curtailment of free [exercise] must be actually necessary to the solution." *Air Force Officer*, 2022 WL 468799, at *10 (citation and quotation omitted).

109.  Finally, Defendants cannot satisfy either prong of strict security—compelling government interest or least restrictive means—by mandating 100% vaccination with a vaccine that is known to be ineffective and obsolete. The government's strict scrutiny analysis is highly fact intensive, and the individualized assessment prescribed by *Burwell* and *Navy SEAL 1*, require the government to perform a marginal cost vs. benefit analysis that takes into

account the current costs and benefits from granting specific exemptions. Defendants have failed entirely to account for the impact of the Omicron variant, and the minimal and rapidly declining efficacy of the vaccine against it, in performing this assessment. Pfizer's CEO has acknowledged that the two-dose regimen required by Defendants "offer[s] very limited protection, if any," and that there is no vaccine currently available that is effective against Omicron. *See* YAHOO!Finance, *supra* note 6. The inability of Defendants' policy to achieve the government's purported interest was underscored recently when 25% of the crew tested positive for COVID on the 100% vaccinated *USS Milwaukee, see* Baldor, *supra* note 8. In any case, while Omicron is much more infectious for the vaccinated and unvaccinated alike, it is also much less deadly, and despite Omicron infections "coming and going all the time," among 100% vaccinated crews, it has had "really no operational impact." *See* Correll, *supra* note 8.

110.   Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their right under RFRA to the free exercise of religion.

**SECOND CAUSE OF ACTION**
**VIOLATION OF FIRST AMENDMENT FREE EXERCISE CLAUSE**
**U.S. CONST. AMEND. I**

111.   Plaintiffs reallege the facts in Paragraphs 1 through 110 as if fully set forth in this Count.

69

112. The First Amendment's Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

113. "Government is not free to disregard the First Amendment in times of crisis." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) ("*Cuomo*") (Gorsuch, J., concurring). "Even in a pandemic, the Constitution cannot be put away and forgotten." *Cuomo*, 141 S. Ct. at 68 (per curiam). Just as "[t]here is no COVID-19 exception to the First Amendment," there is "no military exclusion from our Constitution." *Navy SEALs 1-26*, at *1

114. Governmental regulations that are not neutral or generally applicable "trigger strict scrutiny" when "they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (*citing Cuomo*, 141 S. Ct. at 67-68). "A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1877 (2021).

115. Plaintiffs submitted religious exemption requests, stating that their religious beliefs prohibited them from receiving the available COVID-19 vaccines because of their sincerely held religious beliefs that, among other

things, abortion is an abomination and because the aborted fetal cells were critical to the development of the vaccines, they refuse to participate or support this evil. *See supra* Section V.A ("Plaintiffs' Sincerely Held Religious Beliefs") and Section V.B ("COVID-19 Vaccines Are Critically Dependent on, and Could Not Exist but for, the Use of Aborted Fetal Cell Tissue.").

116. Defendants have not granted any of Plaintiffs' religious accommodation requests, and every Plaintiff who has received a decision has been denied. Several have also had their appeals have been denied as well. *See* Section V.C ("Plaintiffs' RARs and Appeals Have Been Denied"). In issuing these denials, Defendants are unlawfully denied Plaintiffs' requests for accommodation of their sincerely held religious beliefs.

117. Defendants' rules and policies governing religious accommodations—uniformly denying and granting zero exemptions (or close enough to zero to amount to a rounding error—are neither neutral nor generally applicable because they "single out … for harsh[er] treatment," *Cuomo*, 141 S. Ct. at 66, those who choose to remain unvaccinated for religious reasons than those who seek to remain vaccinated for secular treatment. The numbers in Table 1 and Table 2 speak for themselves, with thousands of medical and administrative exemptions granted, compared to a mere handful of religious accommodations for service members who will not remain in the

service. Even if the comparison is limited to permanent medical exemptions—totaling at least 42 (which necessarily excludes any administrative exemptions for those on terminal leave or in the separation process)—the number of such exemptions is still several times larger than those granted religious accommodations. "No matter how small the number of secular exemptions by comparison, *any* favorable treatment … defeats neutrality." *Navy SEALs 1-26*, at * 11 (emphasis in original).

118.   Having established that Defendants' policies are not neutral and substantially burden Plaintiffs' exercise of religion by treating those seeking exemption from vaccination less favorably than those seeking exemption for secular reasons, the burden of proof switches to Defendants who must demonstrate that their policies satisfy strict scrutiny, meaning that they must be (1) "narrowly tailored" (2) "to serve a compelling [government] interest." *Cuomo*, 141 S. Ct. at 67 (*citing Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993)).

119.   Defendants' religious exemption policies fail to satisfy strict scrutiny under the First Amendment for largely the same reasons they fail strict scrutiny under RFRA. *See, e.g., Navy SEALs 1-26*, at *11; *Air Force Officer*, at * 11-12. The DOD Mandate, as a policy and as applied to Plaintiffs, fails to accommodate Plaintiffs' sincerely held religious beliefs. There is no

interest, compelling or otherwise, for Defendants to deny Plaintiffs' religious exemptions or threaten not to accommodate Plaintiffs' sincerely held religious beliefs. Nor have Defendants chosen the least restrictive means of achieving any compelling governmental interest, and in fact, have dismissed and uniformly denied Plaintiffs' alternative, less restrictive mitigation measures. Accordingly, the DOD Mandate, and the Defendants' religious accommodation policies and procedures, cannot survive strict scrutiny.

120.   Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their First Amendment right to the free exercise of religion.

### THIRD CAUSE OF ACTION
### VIOLATION OF FIFTH AMENDMENT DUE PROCESS CLAUSE
### U.S. CONST. AMEND. V

121.   Plaintiffs reallege the facts in Paragraphs 1 through 120 as if fully set forth in this Count.

122.   The Fifth Amendment Due Process Clause provides that no person may "be deprived of life, liberty or property without due process of law." U.S. CONST. AMEND. V. The DOD Mandate would deprive Plaintiffs of all three, as well as and does so without providing "fair notice" of the rules to which they are subject.

123.   The DOD Mandate requires Plaintiffs to take a vaccine without their consent and thereby exposes them to a non-negligible risk of death or

serious injury.

124.   The DOD Mandate "threatens to substantially burden the liberty interests" of Plaintiffs "put to a choice between their job(s) and their jab(s)." *OSHA*, 2021 WL 5279381, at *8. Plaintiffs face not only the loss of the current employment, but also will be barred from other federal or private employment due to their vaccination and discharge status. The DOD Mandate, and its treatment of religious accommodation requests, also burdens other fundamental rights, in particular, the free exercise of religion protected by the First Amendment. *See id.*, at *8 n.21 (citations omitted).

125.   The Defendants' policy of systematic and uniform denial of 100% of RARs is just as much a deprivation of their Fifth Amendment Due Process rights, U.S. CONST. AMEND. V, as it is of First Amendment Free Exercise rights. Due process requires not only notice and an opportunity to be heard, but also an impartial decisionmaker where, unlike here, the outcome is not "predetermined." *See, e.g., McCarthy v. Madigan,* 503 U.S. 140, 148 (1992). The zero or near zero approval rate shows that the Armed Services have "predetermined the denial of the religious accommodations." *Navy SEALs 1-26*, at *6. This is no accident, but the intended result of a process designed to deny Plaintiffs' free exercise rights; their fate has been sealed before the process begins.

74

126.   Vaccine refusal may also result in deprivation of protected property interests. Disciplinary action or discharge status may cause Plaintiffs to lose retirement, veterans, and other governmental benefits to which they are entitled. Loss of pay and benefits amount to hundreds of thousands or even millions of dollars in many cases. *See supra* ¶ 91 (summarizing estimated lost pay and benefits).

127.   Even if Plaintiffs were to become "fully vaccinated," they would be threatened with the loss of this status (and consequent deprivation of protected life, liberty and property interests), at any time and without fair notice, due to changes in the CDC or FDA approval of booster shots and change to the definition of "fully vaccinated." So would the majority of service members who are currently deemed "fully vaccinated." The rapid decline in efficacy and need for booster shots demonstrates that there is no scientific consensus on Comirnaty's efficacy, protection provided, or even dosage, while Pfizer has acknowledged that the two-dose regimen required by the DOD Mandate does not protect against the Omicron variant. "As COVID-19 is a new disease, and the vaccines are even newer, the long-term efficacy of immunity derived from vaccination and infection is not proven." *Klaassen*, 2021 WL 3073926, at *12. Accordingly, the term "fully vaccinated" is unconstitutionally void for vagueness, and this fluid and changing classification cannot be used as the

benchmark for determining who may serve in the military, or alternatively, for depriving Plaintiffs of their life, liberty, property and other fundamental constitutional rights, including the free exercise of their religion.

128.   As a result of the Defendants' unlawful and unconstitutional actions, Plaintiffs face deprivation of their rights to life, liberty and property without due process or fair notice. Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to due process.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF INFORMED CONSENT LAWS & PHSA
### 10 U.S.C. § 1107a, 21 U.S.C. 360bbb-3, 42 U.S.C. § 262

129.   Plaintiffs reallege the facts in Paragraphs 1 through 93 as if fully set forth in this Count.

130.   Defendants have violated the Informed Consent Laws, the PHSA, and the FDA's mandatory labeling regulations. These laws do not provide a private right of action. Accordingly, Plaintiffs' claims for Defendants' *ultra vires* actions in excess of their statutory authority, and in violation of Plaintiffs' rights under applicable statutes and regulations, are brought under the APA. *See, e.g., Austin*, at *2 & *7 n.12 (informed consent violations are "APA claims"). It is well-settled that, where a statute does not provide a cause of action, plaintiffs "are nevertheless entitled to enforce [the statute's]

76

substantive requirements through the judicial review provisions of the APA." *Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists, Inc.,* 393 F.Supp.2d 1362, 1378 (M.D. Ga. 2005).

131. It is undisputed that the FDA-licensed COVID-19 vaccines (Comirnaty and Spikevax) are not available and have not been available since the announcement of the mandate. *See supra* ¶¶ 54-55 & Exs. 4-6, 12, & 14-15. Defendants are instead mandating EUA vaccines that prominently bear EUA labels. *See Austin*, 2021 WL 5816632, at *7. The Informed Consent Laws prohibit the mandatory administration of an EUA product. *See* 10 U.S.C. § 1107a and 21 U.S.C. § 360bbb-3. Plaintiffs' statutory rights are reflected in the fact sheet that the FDA requires to be included as part of product labeling, which expressly states that recipients have the "option to accept or refuse" the EUA product (*i.e.*, it cannot be mandated). Pfizer-BioNTech EUA Vaccine Fact Sheet, *supra* note 27, at 13.

132. Defendants seek to circumvent this express statutory prohibition on mandating an EUA product, stated clearly in the FDA's required product labeling, through guidance documents asserting that ***any EUA vaccine*** may be used interchangeably with, or "as if," it were an FDA-licensed vaccine. *See, e.g.,* Ex. 7, Air Force Guidance, § 3.1.1; Ex. 11, DOD Surgeon Generals Guidance, at 1.

77

133. Defendants' guidance relies on FDA statements regarding interchangeability in the EUA Re-issuance Letters. *See, e.g.,* Ex. 4, Aug. 23, 2021 EUA Re-Issuance Letter, at 2 n.8. But the FDA—the agency delegated the authority to make EUA determinations under 21 U.S.C. § 360bbb-3 and to make statutory interchangeability determinations under 42 U.S.C. § 262—has never made any determination that an EUA product may be mandated or any statutory interchangeability determination. Nor has the FDA waived the labeling required by the Informed Consent Laws, the PHSA and the FDA's labeling regulations thereunder, *see supra* ¶ 51 (discussing PHSA labeling requirements in 42 U.S.C. § 262(a)(1)(B)(i)-(ii) & 21 C.F.R. § 610.60(a)). This is consistent with the fact that all EUA products available and offered to Plaintiffs identify such products as EUA products on every vial, and the fact that every packaging insert continues to advise patients and caregivers that they have the "option to accept or refuse" administration of the product; conversely, no COVID-19 vaccines are available that are labeled as FDA-licensed products (*i.e.*, Comirnaty or Spikevax).

134. The FDA documents relied on by Defendants expressly state that the EUA and the licensed product are "legally distinct" and acknowledge that there are "certain differences" between these products. These legal distinctions include the fact that the EUA BioNTech Vaccine is subject to the

laws governing EUA products, including the statutory right of informed consent (*i.e.*, the "option to accept or refuse"). The FDA-licensed Comirnaty, by contrast, is subject to the heightened statutory requirements under the PHSA for FDA-licensed products, namely, that it meets the PHSA's requirements for safety, potency (or efficacy), and purity, and must use FDA-approved labeling and manufacturing facilities and processes.

135. While the FDA initially asserted that EUA products and the FDA-licensed products are interchangeable because they have the "same formulation," while admitting that there are "certain differences" between them, the FDA subsequently expanded the scope of interchangeable products to encompass products with different formulations that are chemically distinct but "analytically comparable." Ex. 5, Oct. 29, 2021 EUA Re-Issuance Letter & Ex. 6, Jan. 3, 2022 EUA Re-Issuance Letter.

136. The DOD Mandate and the Armed Services Guidance are *ultra vires* actions taken in excess of their statutory authority, and in violation of the substantive requirements of the Informed Consent Laws, the PHSA, and the FDA's labeling regulations, insofar as they: (1) mandate an EUA product and seek to override service members' statutory informed consent and rights to refuse a non-FDA-licensed product; (2) direct the Armed Services, health care providers, and military treatment facilities to administer EUA products as if

they were legally interchangeable with (or legally equivalent to) FDA-licensed products; and (3) seek to deceive service members' into forfeiting their informed consent rights by misrepresenting non-FDA-licensed EUA products as if they were FDA-licensed products and/or by directing service members to ignore (or refusing to provide altogether) the clear statements in the FDA-required labeling that they have the right to refuse the EUA product. The FDA statements on which Defendants rely do not purport to override or waive informed consent rights, to establish any legal equivalency between EUA and FDA-licensed products, or to waive the mandatory requirements of the FDA's labeling regulations.

137.   The DOD Mandate and Armed Services Guidance must therefore be declared unlawful and enjoined insofar as they seek to mandate an EUA product, consistent with applicable precedent. *See generally John Doe #1 v Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004), *modified sub nom.* 2005 WL 774857 (D.D.C. 2005) (enjoining mandatory administration of EUA anthrax vaccine).

138.   Plaintiffs' note that, in other legal challenges to the DOD Mandate, Defendants have asserted the affirmative defense that the DOD Mandate is limited to "EUA-labeled, "BLA-compliant" vaccines (*i.e.*, vaccines manufactured in accordance with the Comirnaty BLA). *See generally Austin*.

But the DOD Mandate and the Armed Services Guidance never use the terms "BLA-compliant," or suggest any such limitation, and the publicly available documents refer only to "EUA" vaccines, without any limitation to "BLA-compliant" lots. The purported limitation of the mandate to "BLA-compliant" lots was announced in the first instance by agency defense counsel in court filings and is entirely unsupported in the record. Courts may not accept "post hoc rationalization by counsel as prime authority for agency decision[s]." *Harrison v. Ocean Bank*, 2011 WL 2607086, at *4 (S.D. Fla. June 30, 2011).

139.  As a result of Defendants' unlawful actions, Plaintiffs will be required either to take a non-FDA-licensed EUA vaccine, or else face the serious disciplinary consequences outlined above that will result in the loss of their livelihoods, careers, benefits, and fundamental rights.

### FIFTH CAUSE OF ACTION
### VIOLATIONS OF ADMINISTRATIVE PROCEDURE ACT
### 5 U.S.C. § 706(2)(A), § 706(2)(C) & § 706(2)(E)

140.  Plaintiffs reallege the facts in Paragraphs 1 through 93 as if fully set forth in this Count.

141.  The DOD Mandate and Armed Services' guidance are *ultra vires* actions "in excess of statutory jurisdiction [and] authority," 5 U.S.C. § 706(2)(C), for the reasons set forth under the Fourth Cause of Action above. The DOD and the Armed Services are departments and agencies of the United States Government. As such, they are agencies created by statute, and "it is

81

axiomatic that an administrative agency's power to promulgate legislative regulations," like the DOD Mandate, "is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, L.Ed.2d 493 (1988); *see also La. Pub. Serv. Comm'n v. FERC*, 476 U.S. 355, 375, 106 S. Ct. 1890, 90 L.Ed.2d 369 (1986) ("an agency literally has no power to act, …, unless and until Congress confers power on it."). While Congress and the President have delegated the Secretary of Defense broad authority, they have expressly withheld the authority to mandate an EUA vaccine without Presidential waiver, which Secretary Austin has neither received nor requested.

142.    The DOD Mandate and the Armed Services' guidance must be set aside as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(A), and because it is not supported by "substantial evidence." 5 U.S.C. § 706(E). The entirety of the DOD Mandate is a two-page memorandum from the Secretary of Defense that cites no statute, regulation, executive order or other legal authority. The DOD Mandate is arbitrary and capricious insofar as it imposes an entirely new mandate on over two million active duty and reserve service members without any explanation, justification, legal basis or authority; any findings of facts or analysis (cost-benefit or otherwise) supporting the directive; seeks to exercise *ultra vires*

action in excess of DOD or Secretary Austin's authority and/or that is expressly delegated to another agency; and is based on patent misrepresentations of the law.

143.   The DOD Mandate is arbitrary and capricious insofar as its sole justification or explanation is a conclusory statement that the Secretary has "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people." Ex. 2, DOD Mandate at 1. Given that the DOD Mandate was issued on the very next day after FDA Comirnaty Approval, it is apparent the DOD blindly relied on the FDA approval and out-of-context FDA statements regarding interchangeability.

144.   Defenandants also purport to rely on the CDC's recommendations in adopting the two-dose regimen, but have ignored the CDC's unanimous recommendation that all eligible adults should receive a third booster shot. *See* CDC, *CDC Expands Eligibility for COVID-19 Booster Shots to All Adults,* CDC Media Statement (Nov. 19, 2021), available at: https://www.cdc.gov/media/releases/2021/s1119-booster-shots.html. Such selective picking and choosing of which recommendations to follow, without any explanation, is the essence of arbitrary and capricious decision-making.

145.   The DOD Mandate is also arbitrary and capricious because it constitutes an unannounced and unexplained departure from a prior policy. In

a July 6, 2021 memorandum from the Office Legal Counsel, the DOD interpreted the informed consent requirements in 10 U.S.C. § 1107a "to mean that DOD may not require service members to take an EUA [vaccine]" without first obtaining a Presidential Waiver under 10 U.S.C. § 1107a. *See* Ex. 18, Office of Legal Counsel, Vaccine Mandate Opinion at 16. There has been no Presidential Waiver, yet the Defendants are mandating use of EUA vaccines. "[A]gencies must typically provide a 'detailed explanation' for contradicting a prior policy;" they may not, as DOD has done here, "depart from a prior policy *sub silentio*." *OSHA*, 2021 WL 5279381, at *5 (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515, 129 S. Ct. 1800, 173 L.Ed.2d 738 (2009)).

146.   Finally, the DOD Mandate and Armed Services Guidance are arbitrary and capricious, and unsupported by substantial evidence, insofar as they categorically eliminated existing exemptions for previous documented infections under AR 40-562, or to consider natural immunity in its religious exemption decisions. *See, e.g., Navy SEAL 1*, at *16 & n.10; *Navy SEALs 1-26*, at *10; *Air Force Officer*, at *10. In doing so, Defendants have "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

147.   As a result of Defendants' unlawful actions, Plaintiffs will be required either to take an unlicensed vaccine, pursuant to an unlawful

directive, or else face the serious disciplinary consequences outlined above that will result in the loss of their livelihoods, careers, benefits, and fundamental rights.

**SIXTH CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. § 1331 & § 2201**

148.   Plaintiffs reallege the facts in Paragraphs 1 through 93 as if fully set forth in this Count.

149.   Where an agency or officer of the United States has acted *ultra vires* in violation of a statute or otherwise in excess of its delegated authority, or where agency action is deemed not to be final and not subject to review under the APA, a person injured by such action may assert a claim for specific relief. Review of such agency or officer action is available where the *ultra vires* action "wholly deprive[s] the [party] of a meaningful and adequate means of vindicating its ... rights" under federal statutes. *Rhode Island Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 41–42 (1st Cir.2002).

150.   Plaintiffs' injuries are due to the *ultra vires* actions of Defendant agencies and officers of the United States, which have wholly deprived of their rights under federal laws not to be required to take a non-FDA-licensed vaccines (specifically their rights under the Informed Consent Laws and the PHSA) and their rights under RFRA not to have their free exercise of religion substantially burdened in the absence of a compelling governmental interest

85

and the use of the least restrictive means. Moreover, Plaintiffs have been deprived of their statutory rights through the implementation of the Armed Services Guidance, which are guidance documents that may be deemed not to be final agency actions subject to APA review. Moreover, the Armed Services Guidance and implementation appears to directly conflict with the express terms of the DOD Mandate itself, which permits only FDA-licensed vaccines labeled as such to be mandated. To the extent that these agency actions are deemed not to be subject to APA review, Plaintiffs seek judicial review and injunctive relief from these actions pursuant to the inherent equity powers of the Court pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1331.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

A.   Declare the DOD Mandate to be an unconstitutional, unlawful, and *ultra vires* action;

B.   Enjoin the implementation or enforcement of the DOD Mandate and the Armed Services Guidance by the Defendants with respect to the Plaintiffs;

C.   Declare that the Defendants' religious exemption processes violates services members' rights under RFRA, the First Amendment Free Exercise Clause, and the Fifth Amendment Due Process Clause, and that Defendants' religious exemption processes fails to satisfy strict scrutiny;

D.   Enjoin any adverse or retaliatory action against the Plaintiffs as a result of, arising from, or in conjunction with the Plaintiffs' RAR requests or denials, or for pursuing this action, or any other

action for relief from Defendants' constitutional, statutory, or regulatory violations;

E.    Declare unlawful the administration of any EUA vaccine pursuant to the DOD Mandate or the Armed Services Guidance, and enjoin the administration of any EUA vaccine by the Defendants to the Plaintiffs;

F.    Award plaintiffs' costs and attorneys' fees and any other relief this Court may find appropriate.

Respectfully submitted,

*/s/ Brandon Johnson*
DC Bar No. 491370
*/s/ Travis Miller*
TX Bar No. 24072952
Defending the Republic
2911 Turtle Creek Blvd., Suite 300
Dallas, TX 75219
Tel. (214) 707-1775
Email: bcj@defendingtherepublic.org
Email: twm@defendingtherepublic.org

87

## CERTIFICATE OF SERVICE

This is to certify that I have on this day e-filed the foregoing Plaintiffs'
Complaint for Declaratory and Injunctive Relief using the CM/ECF system,
and that I have delivered the filing to the Defendants, as well as the United
States Attorney General and the United States Attorney for the Middle
District of Florida, by mail at the following addresses:

This 2nd day of March, 2022.

Respectfully Submitted,

*/s/ Brandon Johnson*
Brandon Johnson

Lloyd J. Austin III
Secretary of Defense
1000 Defense Pentagon
Washington, DC 20301-1000

Karin Hoppmann
Acting United States Attorney
U.S. Attorney's Office
400 North Tampa Street, Ste 3200
Tampa, FL 33602

Merrick Garland
Attorney General
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Frank Kendall
Secretary of the Air Force
1670 Air Force Pentagon
Washington, DC 20330-1670

ADM Karl Schultz
Commandant U.S. Coast Guard
2703 Martin Luther King Junior Ave.
Washington, DC 20593

Carlos Del Toro
Secretary of the Navy
1000 Navy Pentagon
Washington, DC 20350-1000

Christine E. Wormuth
Secretary of the Army
101 Army Pentagon
Washington, DC 20310-0101